2019 IL App (1st) 181073

SIXTH DIVISION
September 27, 2019

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-18-1073

| | | |
|---|---|---|
| PAMELA WRIGHT-YOUNG, Independent Administrator of the Estate of Tyrone Lawson, Deceased, | ) ) ) | Appeal from the |
| Plaintiff-Appellee, | ) ) | Circuit Court of Cook County. |
| v. | ) ) | |
| CHICAGO STATE UNIVERSITY; RONNIE WATSON, Individually and as Chief of Police at Chicago State University; and THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, | ) ) ) ) ) | No. 14 L 488 Honorable Thomas J. Lipscomb, |
| Defendants | ) ) | Judge Presiding. |
| (The Board of Education of the City of Chicago, Defendant-Appellant). | ) ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Pierce and Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    Tyrone Lawson, the 17-year-old son of plaintiff Pamela Wright-Young, was fatally shot outside a high school basketball game. Ms. Wright-Young, as the administrator of her son's estate, brought this wrongful death and survival action against the Board of Education of the City of Chicago (Board) and the chief of police and student services for Chicago State University (CSU), whose Jones Convocation Center (JCC arena) was the venue where the basketball game was held. Throughout the pendency of the case, the trial court rejected various statutory

immunities asserted by the Board. The case was tried and a jury—concluding that the Board was liable but Mr. Watson was not—awarded Ms. Wright-Young damages in the amount of $3.5 million. The Board now appeals.

¶ 2     We conclude that the trial court erroneously rejected the Board's claim of absolute immunity with respect to most of the theories of liability presented at trial, as those theories all related to the Board's failure to provide adequate police protection services. Absolute immunity did not apply, however, to Ms. Wright-Young's theory that the Board failed to communicate prior acts of violence at Board-sponsored sporting events to CSU, which was directly responsible for the parking lot where Tyrone was killed. Because this remaining claim is not defeated by any of the Board's other arguments, we affirm the jury's verdict under the general verdict rule.

¶ 3                                    I. BACKGROUND

¶ 4                          A. Ms. Wright-Young's Allegations

¶ 5     In her complaint, Ms. Wright-Young alleged that the basketball game held on January 16, 2013, between Morgan Park High School (Morgan Park) and Simeon High School (Simeon) was a "highly publicized" game between two "bitter rivals" that was expected to be especially well-attended because Simeon's star player was considered a top college recruit. Due to a capacity crowd, a number of individuals, including Ms. Wright-Young's son Tyrone, were unable to purchase tickets and congregated outside of the arena during the game.

¶ 6     Ms. Wright-Young alleged that "prior known violence between the rival schools," including "an incident involving a stabbing at a football game *** in September of 2012 where three students were injured," created a "strong foreseeability of gang violence underpinning the event." According to Ms. Wright-Young, the Board chose CSU as a neutral location to host the game, "advertised and invited students from both [high schools], among others, and created the

2

illusion they would be providing adequate security for all invitees."

¶ 7    Ms. Wright-Young further alleged that immediately following the game there was "a panic situation," with various fights breaking out as spectators began to spill out into the front and back parking lots of the JCC arena. According to Ms. Wright-Young, during this chaos two men approached Tyrone and some friends he was standing with and opened fire. Tyrone attempted to flee but was shot multiple times and died of his injuries. The two men were arrested and charged with first degree murder.

¶ 8    Ms. Wright-Young brought a variety of claims against the Board and against Mr. Watson, alleging various actions that she claimed contributed to her son's murder.

¶ 9                    B. The Board's Immunity Arguments

¶ 10    The Board moved to dismiss the claims against it on the basis that it was immune from suit under section 4-102 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act or Act) (745 ILCS 10/4-102 (West 2012)), which provides absolute immunity for a local public entity's failure to provide adequate police protection services. The trial court at first denied the motion, but on reconsideration granted it in part, striking those of Ms. Wright-Young's allegations the court felt clearly concerned the failure to provide police protection services.

¶ 11    The Board continued to assert section 4-102 immunity—along with a number of other statutory immunities—in its affirmative defenses. It later moved for summary judgment under section 4-102 as well as section 2-201 (*id.* § 2-201 (immunity for discretionary policy decisions)). Although the trial court denied the Board's motion for summary judgment "for the reasons stated in the record," a transcript of the hearing on the motion does not appear in the record.

3

¶ 12    The Board raised its immunity defenses again at trial, when it moved for a directed verdict at the close of Ms. Wright-Young's case. Counsel for the Board briefly outlined, this time for a new judge, its prior arguments in favor of a finding that it was immune under sections 4-102 (for failures to provide adequate police protection services), 2-201 (for discretionary policy decisions), and 2-107 and 2-210 of the Act (*id.* §§ 2-107, 2-210 (for the provision of information)). In denying the motion, the trial court provided only the following explanation:

> "THE COURT: Okay. All right.
>
> As far as the [Board]'s motion for directed verdict, I'll deny it.
>
> And I think there's an issue of assumption of—not assumption—voluntary undertaking or assumption of duty that may apply to those immunities proffered by the Chicago Public Schools. In other words, I think it may be contrary to those immunities that are listed there."

¶ 13    The Board raised its immunity arguments one final time in its posttrial motion, but that motion was also denied.

¶ 14                              C. The Evidence at Trial

¶ 15    A six-day jury trial was held in this case in November 2017. The jury heard from, among others, Tyrone's parents, current and former employees of the Board and CSU, and the parties' respective experts.

¶ 16                              1. Board Officials

¶ 17    The jury was shown a redacted September 14, 2012, letter that Everett Edwards, the principal of Morgan Park High School, sent to parents whose students attended the school. That letter began by referencing an "unfortunate event that took place on Friday, September 7, 2012, during the Morgan Park v. Simeon football game," during which "a disturbance took place in the

stands" and "[m]ost fans took off running for an exit," but during which, "[t]hankfully, only three students were injured." The letter then assured parents that the local school council (LCL) had met to discuss next steps they could take "to insure the safety of [their] students at all school-sponsored events." Principal Edwards told parents "[t]he Administration reached out to [Chicago Public Schools] Sports Administration" and "[t]hey have assured us that modifications to security plans have been made in order to maintain a safe environment during sporting events."

¶ 18    Mr. Edwards testified that, when he sent this letter, he had no actual knowledge regarding what changes, if any, had been made to the Board's security plans. When asked why he sent the letter, Mr. Edwards explained:

> "The purpose of the letter was to inform parents of the incident that had occurred previously. It was also designed to let them know we were calling upon our all [*sic*] resources to keep their children safe. There are no guarantees, but we wanted to make sure that our parents knew that we were as much on the situation as we could be."

¶ 19    Calvin Davis, the Board's former director of sports administration and facilities, testified that his duties included coordinating Board-sponsored events at outside venues like the JCC arena. Mr. Davis was confident that under the Facilities Usage Agreement (venue agreement) the Board entered into with CSU for the game, the Board was only responsible for the security of fans while they were inside the arena. Mr. Davis's testimony echoed the Board's position throughout this case that, under the venue agreement, there was a clearly defined division of labor: the Board was responsible for security inside the arena, and CSU was responsible for security outside the arena. Mr. Davis testified that, in keeping with this understanding, the Board's security plan only covered the entrance to the facility and the facility interior. When asked if parents were told that the Board had no responsibility for the safety of students as they

5

entered and exited the arena, Davis said "[n]o, I don't believe parents [were] being told that." If they were, he said, that information would come from the individual schools, as the athletic department did not communicate directly with parents.

¶ 20    Mr. Davis also testified that for 10 years the Board had used the same basic security plan for events at off-site venues, whether those events were basketball games, wrestling matches, or cheerleading competitions. Although "slight modifications" may have been made to the plan from time to time, Mr. Davis could not identify any specific modifications that were made in advance of the Morgan Park-Simeon basketball game. He acknowledged that Morgan Park's principal, Everett Edwards, had sent a letter to parents several months before the game telling them that changes had been made to the security plan based on an incident at a football game between the two schools, but stated "I couldn't tell you what specific modifications were made, if any, to the plan."

¶ 21    Mr. Davis did not recall the Board providing any information to CSU about a history of violence at sporting events between Morgan Park and Simeon before the venue agreement was signed. In his opinion, that was not the sort of information that would be exchanged "[w]ith the contract." Rather, when the "[respective] security forces talked, *** they would mention it and maybe plan." Mr. Davis stated "[i]f there was something, I'm sure as they planned it would be discussed." Mr. Davis was "[v]aguely" familiar with Ronnie Watson, CSU's chief of police, having met him some years earlier in connection with a different event, but had no discussions with him prior to the Morgan Park-Simeon basketball game.

¶ 22    Mr. Davis was shown a printout of an e-mail he wrote on January 18, 2013, just two days after the basketball game, to school principals and athletic directors, in which everything but the first line had been redacted. That line read: "As a result of numerous acts of violence outside of

basketball contests in the past two weeks ***." Mr. Davis could not remember what events he had been referring to or whether parents had been made aware of those events. He downplayed the phrase "numerous acts of violence," explaining that Tyrone's shooting, "being such a tragic incident, *** probably heightened *** the need for security." But in the two weeks prior to the Morgan Park-Simeon game, Mr. Davis insisted nothing more serious than a "fight here or a scuffle there" had occurred.

¶ 23    Mr. Davis had himself attended the Morgan Park-Simeon game on January 16, 2013. Although the game was an important one, it was not unusual for Chicago Public School (CPS) basketball games to be played at the JCC arena. He could not recall seeing any security in the parking lot outside the arena. When the game was over, Mr. Davis witnessed a scuffle in the handshake line but said the incident was "immediately contained." People then left the arena in an orderly fashion, and he "didn't sense anything out of the ordinary." When shown an e-mail he wrote the day after the game, in which he described a "large commotion on the court" that "could have been much worse," Mr. Davis again downplayed his prior statements, explaining that the commotion was short-lived and involved only the players and coaches.

¶ 24    Mr. Davis characterized the level of security at the Morgan Park-Simeon basketball game as "very high." In addition to CSU officers and off-duty Chicago police officers hired for the evening, the Board had a trained special event staff of around 50 individuals, all wearing bright gold shirts or jackets, posted at entrances and exits, washrooms, concession stands, and throughout the stands. Screening at the door was done by a combination of CPS security staff and Chicago police. Everyone entering went through an X-ray machine or hand wands.

¶ 25                                          2. Tyrone's Parents

¶ 26    Ms. Wright-Young testified that Tyrone was her only child and she kept a close watch

over him. She knew who his friends were and would often drop the boys off and pick them back up from various events. If she had any concerns about her son's safety at a particular event, she would not let him go.

¶ 27    Ms. Wright-Young had been alarmed when she picked Tyrone up from the September 2012 Morgan Park-Simeon football game referenced in Principal Edwards's letter and saw police cars. Although Tyrone reassured her both that there had been no gunshots, only people setting off firecrackers, and that rumors of a stabbing were not true, she thought he might be minimizing what happened so that she would not prohibit him from going to future sporting events.

¶ 28    Tyrone's stepfather, Gregory Young, also recalled the commotion after the football game. Tyrone told him that there was "a fight that broke off into the stands, *** people just started running everywhere," and "[s]omebody with a screwdriver or something stabbed someone else." After that incident, Mr. Young said that he and Ms. Wright-Young "weren't going to let [Tyrone] be going to too many functions because it wasn't safe." Mr. Young believed that the intense rivalry between the two schools had created "an unsafe environment."

¶ 29    A week later, Tyrone's parents received the letter from Principal Edwards explaining what had happened at the football game, which included what Ms. Wright-Young viewed as "a promise that they were going to do some things [so] that it wouldn't happen again." The letter "stood out to [her]" because it mentioned the local school council, or LSC. She herself had been president of the LSC at Tyrone's elementary school for six years, and in her experience, the LSC "basically runs a school." Her understanding of the letter was that the incident at the football game had been discussed by the LSC and "something did take place to make sure this [type of incident] was not going to happen again." According to Ms. Wright-Young, this "wiped out a lot of [her] concerns" and made her feel comfortable with Tyrone attending Board-sponsored

sporting events again.

¶ 30    On the afternoon of January 16, 2013, Tyrone asked his parents if he could attend the Morgan Park-Simeon basketball game that evening. Although they were concerned because it was a school night, they understood it was an important game between two top-ranked schools and they finally relented. For Ms. Wright-Young, Principal Edwards's letter played a role in that decision. She told the jury "[t]hat letter really made me feel like it was okay for Tyrone to go to that game."

¶ 31    Mr. Young also remembered reading the letter, which he said made him feel "a little bit more at ease" with letting Tyrone attend another sporting event. He and Ms. Wright-Young discussed the matter and "figured that [because the game would be at] a college campus *** it should be a safe environment." As a state facility with state police on patrol, Mr. Young expected that his son would be protected.

¶ 32    On cross-examination, Tyrone's parents both acknowledged that, despite their concerns, they had not contacted anyone at Morgan Park about Principal Edwards's letter and had not attended the LSC meeting in September when that letter was discussed. Ms. Wright-Young was not aware of any other problems at sporting events during the 2012-13 school year. Mr. Young acknowledged that although he was "highly concerned" following the incident at the September 2012 football game, neither he nor his wife reached out to anyone at the school or attended any of the subsequent LSC meetings to voice their concern.

¶ 33                                    3. The CSU Police Force

¶ 34    CSU Lieutenant Sharon Robinson testified that she was stationed inside the JCC arena during the January 16, 2013, Morgan Park-Simeon basketball game. She estimated the crowd at 4000 or 4500 people, possibly as many as 5000. For such events, CSU has officers "posted

9

throughout the building, at the main entrance, the first floor, second floor, and *** just circulat[ing] through the building." Outside the arena, CSU is responsible for "[t]raffic control and patrolling the campus grounds." CSU's chief of police, Ronnie Watson, was in charge of coordinating CSU's security efforts with those of the Board and the Chicago Police Department.

¶ 35    Lieutenant Robinson was responsible for determining the number of CSU officers who would be needed that night and relaying that number to Chief Watson for his approval. According to an event planning form filled out the day before the game, of the 13 or 14 CSU officers scheduled to work the game that night, 5 were assigned to patrol the parking lots of the CSU campus. Lieutenant Robinson testified that, in making this determination, she was not made aware of the disturbance that took place at the September 2012 Morgan Park-Simeon football game or of any recent acts of violence outside of high school basketball games. She testified that if she had been made aware of such incidents, she "probably would have discussed it with Chief Watson" for fear that the violence might "spill over to the [CSU] campus" and "to ensure that we did have enough people or to see if we wanted to do anything different." At no time did anyone from the Board request additional security for this particular game.

¶ 36    CSU Sergeant Wilbert Norey was working as the "inside supervisor" for the JCC arena on the night of the Morgan Park-Simeon game. He testified that a number of factors go into determining what level of security is needed, including the anticipated crowd size and type of event. Sergeant Norey stated, "[w]e kind of try to tailor it to the event, the sheet, the amount of people, where we post, things of that nature, what we work with." For this event, CSU worked "closely" with the Board because, as Sergeant Norey explained, security for the Board [was] at the front doors and [was] thus "the buffer for contraband coming into the event." But Sergeant Norey said he only had "surface knowledge" about the schools that were playing. He knew that

they were CPS high schools, but that was it.

¶ 37    Sergeant Norey testified that prior violence between the schools was an important factor that could have impacted what he did to ensure the safety of the fans. He was not made aware of any prior acts of violence at CPS basketball games. Although Sergeant Norey later learned of the incident at the Morgan Park-Simeon football game, no one told him about it before the January 16, 2013, basketball game. He testified that knowledge of that incident would have been important to him for security planning purposes.

¶ 38    Sergeant Norey explained that minutes before the game ended, with the doors locked so no one else could enter the arena, a high-school-aged girl and a man who said he was her father began banging on the door. The girl looked "distraught," and the man "stated that he wanted to get his daughter inside of the convocation center for [her] safety." Sergeant Norey let them in and the girl, who was crying, said that there was a group of high-school boys in the A-15 parking lot, which is about 250 yards from the JCC arena, and someone had flashed a gun at her and her father. Sergeant Norey immediately dispatched units to the parking lot. According to the CSU radio log, this was at 8:44 p.m. Sergeant Norey testified that he tried to get the man to come inside with his daughter but the man said he "had something to do" and went off towards the A-15 parking lot. Sergeant Norey later learned that the man was Michael McNabb, who, with his brother Brian Hewlett, were later arrested for shooting Tyrone Lawson.

¶ 39    CSU officers stated that they were immediately at the scene and had cleared the parking lot within one minute, or by 8:45 p.m. Fifteen minutes later, the crowd began exiting the JCC arena. And 15 minutes after that, as CSU officers were directing people off campus, a call came over the radio that shots had been fired.

¶ 40    In the 48 hours after Tyrone's shooting, Sergeant Norey, with the help of two Chicago

police officers, interviewed witnesses, provided them with a line-up for identification of the shooters, and collected forensic evidence. He spoke to three of Tyrone's friends who witnessed the shooting, as well as Michael McNabb and Brian Hewlett, who were ultimately determined to be the shooters. According to Sergeant Norey, Tyrone's friends, who indicated that they were affiliated with the Gangster Disciples, told him that "there was a history between Michael McNabb and these young men, that they knew each other, that they had grievances, [and] that they were angry with each other or hostile."

¶ 41 Tyrone's friends told Sergeant Norey that they had tried to get into the JCC arena but were turned away and decided to hang around in the parking lot. He guessed that this was toward the end of the game when the doors had already been closed. When Sergeant Norey interviewed Mr. McNabb, he recognized him as the man who had brought his daughter inside the arena. Sergeant Norey learned that Mr. McNabb and Mr. Hewlett had an "extensive" history of involvement with the Gangster Disciples. When asked why there would be a conflict between members of the same gang, Sergeant Norey explained:

"Well, one is a younger group and one is an older group. Mr. McNabb['s] was in their 30s. The younger crew was in their late teens, 20s, and they are from different neighborhoods, and the neighborhoods are—there's a friction between the neighborhoods."

¶ 42 One of Sergeant Norey's investigative conclusions was that the shooting "had to do with something that occurred outside of Chicago State University" and "had nothing to do with the event." The two suspects were apprehended within minutes of the shooting and the gun that Sergeant Norey believed had been used in the crime was confiscated.

¶ 43 Ronnie Watson, a 33-year veteran of the Chicago Police Department, and the former

chief of police for Cambridge, Massachusetts, testified that in his role as CSU's chief of police and student services he planned, implemented, and oversaw security for events held at the JCC arena. Mr. Watson testified that campus police, who are State of Illinois police officers, are on duty 24 hours a day. They are responsible for patrolling the entire 160-acre campus and the 95th Street corridor, where students travel to and from public transportation. Regularly reporting to Chief Watson are a captain, 2 lieutenants, 6 sergeants, and around 20 officers. Acknowledging that it was "a small department," Chief Watson testified that there are a minimum of three officers on patrol in squad cars each night: a shift commander, a sergeant in the field, and one to three additional officers. For the Morgan Park-Simeon basketball game, six officers were patrolling the grounds in squad cars.

¶ 44    No one from CSU's legal department showed Chief Watson the venue agreement between CSU and the Board prior to the basketball game. CSU's event planning form for the basketball game was filled out and sent to Chief Watson 24 hours in advance of the game. The form was one CSU had used many times before, for graduation ceremonies, concerts, and other large gatherings. Chief Watson had no information leading him to believe he needed to do anything to change that plan.

¶ 45    A pre-season security meeting between the Board and Chief Watson and his command staff was held. Chief Watson also attended the walk though with representatives for the Board and Chicago police. No one from the Board ever voiced any concerns about the basketball game to him. No one ever showed him Principal Edwards's letter or said anything to him about prior violent incidents that year at CPS sporting events. Chief Watson had to be somewhere the night of the game but went into the arena before he left campus and saw that CPS people and CSU people were posted as they were supposed to be. He "was satisfied that everything was fine."

¶ 46    Chief Watson acknowledged that people coming to events at CSU have an expectation that they will be able to safely come and go from the campus. He agreed that different types of events require different levels of security. Past violent incidents on campus, if brought to his attention, were something he would have taken into consideration in planning security for the event. When asked if "any alleged violence between [the] schools that were playing that night and fans at a sporting event four months prior" could increase the risk of violence at the basketball game, Chief Watson agreed that "[i]t could have a bearing on the conduct of the event, yes."

¶ 47    Chief Watson took no part in the post-shooting investigation, which was already underway when he was called back to campus after the game. He stated that this was the first homicide in CSU's history.

¶ 48                                4. Expert Witnesses

¶ 49    James Bondi, Ms. Wright-Young's school security expert, testified that after reviewing relevant deposition testimony it was his opinion that the Board demonstrated "a reckless disregard for the safety and well-being of people they were in charge of on [the CSU] campus." According to Mr. Bondi, the Board should have realized that increased security was needed for this event, should not have allowed crowds to congregate outside the arena doors, and should have posted security personnel in the parking lots. Mr. Bondi was also of the opinion that the Board failed to adequately coordinate security planning with CSU. Unaware of past violent incidents at sporting events, CSU's officers incorrectly "expected to have a comparable event from years past" and "just cookie-cut the number of staff and planning that they had done in years past."

¶ 50    University of Texas professor of criminology Bruce Jacobs testified as an expert for the

Board. In his opinion, security at the Morgan Park-Simeon basketball game was "massive," up to four times what he would expect at a similar game. Mr. Jacobs described the Board's security plan as both "layered and sequential" and "textbook," with emphasis placed on crowd control, a visible security presence, and "very clearly delineated" roles. Mr. Jacobs stated that it "was clear in the investigative file" and from the testimony of the officers who conducted the investigation that Tyrone's shooting had been gang related. In his opinion, the shooting was an example of how crimes will sometimes be committed in defiance of a strong police presence and why crime is not fully preventable.

¶ 51                                  5. Jury Instructions and Verdict

¶ 52    The jury was instructed that the Board was liable if its willful and wanton conduct had been a proximate cause of Tyrone's death, that "willful and wanton conduct" meant "a course of action which shows an utter indifference to or reckless disregard for the safety of others," and that Ms. Wright-Young alleged the Board had acted willfully and wantonly when it:

"a. Failed to implement a security plan by failing to assign or maintain posts within the arena;

b. Failed to implement a security plan by failing to keep entrances and exits clear of crowds during and immediately after the game;

c. Failed to implement a security plan by allowing fans to engage in multiple fights inside the arena and outside the entrances;

d. Failed to implement an appropriate security plan for the safety of students given the elevated risks for violence at the event;

e. Failed to implement a security plan by failing to prevent fans from exiting the arena in a disorderly manner; [and]

15

f. Failed to communicate prior acts of violence at sporting events to Ronnie Watson and Chicago State University prior to January 16, 2013."

¶ 53 The jury found that the Board was liable, but Mr. Watson was not, and awarded Ms. Wright-Young damages in the amount of $3.5 million. In answer to a special interrogatory, the jury also found that the Board's conduct had been willful and wanton.

¶ 54 The Board requested and was denied two additional special interrogatories asking (1) if Mr. Davis and another athletic department staff member held positions within the Board's sports administration department "in which they exercised discretion or made policy decisions about whether and how to provide security" at the basketball game and (2) if the Board was "providing police protection services by staffing security officers inside of the [JCC arena]" during the game.

¶ 55                              II. JURISDICTION

¶ 56 The trial court denied the Board's posttrial motion on April 30, 2018, and the Board timely filed its notice of appeal on May 21, 2018. We have jurisdiction under Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 57                              III. ANALYSIS

¶ 58 On appeal, the Board urges us to reverse the judgment entered against it outright or, in the alternative, to remand for a new trial. The Board contends that (1) it owed no duty to protect Tyrone from the criminal acts of third parties, (2) the trial court erroneously rejected its assertions of immunity under the Tort Immunity Act, (3) if qualified, rather than absolute immunity applies, the jury's finding that the Board's conduct was willful and wanton was against the manifest weight of the evidence, and (4) the trial court improperly refused to submit the

Board's requested special interrogatories to the jury. Because we agree with the Board that the trial court improperly rejected its assertions of immunity as to the majority of the claims in this case, we begin with the Tort Immunity Act. We then address the Board's other arguments as they relate to Ms. Wright-Young's sole remaining claim.

¶ 59                                   A. Statutory Tort Immunity

¶ 60    In *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 25 (1959), our supreme court abolished the common law doctrine of sovereign immunity, under which governmental entities in Illinois had long enjoyed immunity from tort liability. In response, our legislature enacted the Tort Immunity Act (745 ILCS 10/1-101 *et seq.* (West 2012)). *DeSmet v. County of Rock Island*, 219 Ill. 2d 497, 505 (2006). "[T]he purpose of the Act is to protect local public entities and public employees from liability arising from the operation of government" *(id.)* and, in doing so, "to ensure that public funds [are] not dissipated by private damage awards" (*Ware v. City of Chicago*, 375 Ill. App. 3d 574, 578 (2007)). Here, it is undisputed that the Board is a "local public entity" and its employees are "public employees" as those terms are defined in sections 1-206 and 1-207 of the Act (745 ILCS 10/1-206, 1-207 (West 2012)).

¶ 61    The Act contains "an extensive list of immunities based on specific government functions." *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466, 471 (2001). Some of the provisions immunize only negligent conduct, leaving open the possibility of liability based on a public entity's willful and wanton conduct. Others immunize public entities from liability for any injury, without regard to the nature of the tortious conduct. Compare 745 ILCS 10/4-105 (West 2012) (no liability for the negligent failure to provide medical care to a prisoner in custody), with 745 ILCS 10/4-106(b) (West 2012) (blanket immunity for "[a]ny injury inflicted by an escaped or escaping prisoner"). It is a public entity's

burden to assert and prove an immunity provided for in the Act. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 370 (2003). Unless a provision of the Act is shown to apply, the public entity is liable in tort just as any private party would be. *Id.* at 368-69. Whether immunity applies is a question of law we review *de novo*. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 267 (2003).

¶ 62    As an initial matter, it is clear to us that the trial court failed to understand that an absolute immunity protects a local public entity or employee even if that party would otherwise have a duty based on a voluntary undertaking. Specifically, when it denied the Board's motion for a directed verdict the court said "I think there's an issue of *** voluntary undertaking or assumption of duty that may apply to those immunities" and "may be contrary to those immunities that are listed there." This is not correct. As our supreme court made clear in *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 346 (1998), "the existence of a duty and the existence of an immunity are separate issues." (Internal quotation marks omitted.) "[W]hen a court finds, on the facts of a particular case, that the General Assembly has granted a public entity immunity from liability, the court may not then negate that statutory immunity" by applying common law tort principles. *Id.* When the Board asked the court to enter a directed verdict in its favor the trial court wrongfully failed to consider the Board's immunity arguments. We consider them now.

¶ 63             1. Section 4-102 Immunity for Inadequate Police Protection

¶ 64    The Board argues that the jury in this case was improperly allowed to base its verdict on the Board's failure to provide adequate police protection services. The jury was specifically instructed that Ms. Wright-Young's claims against the Board were based on its failures to "implement an appropriate security plan for the safety of students given the elevated risks for violence at the event," to "assign or maintain posts within the arena," to "keep entrances and

18

exits clear of crowds during and immediately after the game," to prevent fans from "engag[ing] in multiple fights inside the arena and outside [its] entrances," and to "prevent fans from exiting the arena in a disorderly manner."

¶ 65 We agree with the Board that each of these theories of liability describes police protection services—conduct for which absolute immunity is afforded under section 4-102 of the Act. That section provides:

"Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 ILCS 10/4-102 (West 2012).

¶ 66 There is no question that this immunity protects the Board from liability where it is alleged that the Board's failure to provide adequate security resulted in a crime being committed against a student. See, *e.g.*, *Castillo v. Board of Education of the City of Chicago*, 2018 IL App (1st) 171053, ¶ 2 (no liability where student was attacked off campus); *Albert v. Board of Education of the City of Chicago*, 2014 IL App (1st) 123544, ¶ 56 (no liability where student was killed on his way home from school); *Green v. Chicago Board of Education*, 407 Ill. App. 3d 721, 723 (2011) (no liability where student was shot and killed by a fellow student). Our supreme court has extended section 4-102 immunity to conduct that, though not itself the provision of police protection services, "implicate[s] the structural adequacy of [such] services." *DeSmet*, 219 Ill. 2d at 513-14. In *Doe v. Village of Schaumburg*, 2011 IL App (1st) 093300, ¶ 16, for example, we held that section 4-102 immunity applied to a "failure to properly train and supervise employees, or to have in force procedures to ensure the adequate performance of

19

[those employees'] duties."

¶ 67 We reject Ms. Wright-Young's contention that her allegations are more properly characterized as the failure to supervise or monitor students attending the basketball game, conduct for which the Board would enjoy only qualified immunity under section 3-108 of the Act (see 745 ILCS 10/3-108 (West 2012) (providing immunity for negligent but not willful and wanton failures to supervise activities or the use of public property)). *Reyes v. Board of Education of the City of Chicago*, 2019 IL App (1st) 180593, is an instructive counter-example demonstrating this point. In that case, which involved a disabled student who was sexually assaulted by a nondisabled student on a special needs school bus, the plaintiffs alleged that an aide assigned to the bus often fell asleep during her shift and allowed the nondisabled student to "roam around the bus at will." *Id.* ¶¶ 3, 10. Characterizing the plaintiffs' claim against the Board as one based on a failure to provide police protection services or prevent a crime, the trial court concluded that the Board was immune from liability under section 4-102. *Id.* ¶ 4.

¶ 68 This court reversed. *Id.* ¶ 46. Quoting *Doe v. Chicago Board of Education*, 213 Ill. 2d 19, 27 (2004), another case involving a school bus attendant, we emphasized that in determining whether section 4-102 immunity applies, a court's focus should be on " 'the purpose of providing the attendant, rather than the conduct causing the injury.' " *Reyes*, 2019 IL App (1st) 180593, ¶ 44. The attendant in *Reyes* "was tasked with managing student behavior and physically assisting students with getting on and off the bus." *Id.* As such, her function was more akin to that of a "teacher or a hall monitor whose very presence may prevent unsafe activity or untoward behavior" than someone functioning as police personnel. (Internal quotation marks omitted.) *Id.* In reaching this holding, we found it significant that the plaintiffs in that case "did not allege anything in their complaint that indicate[d] that [the bus attendant] also provided services

20

performed by police personnel, *such as weapons detection, traffic control, and crowd and security control*." (Emphasis added and internal quotation marks omitted.) *Id.* ¶ 45. These are precisely the things Ms. Wright-Young claims the Board failed to do here. Under the reasoning in *Reyes*, the Board was entitled to absolute immunity with respect to such claims. Those claims should not have gone to the jury.

¶ 69    The one remaining claim is the Board's alleged failure to adequately inform CSU of either the disturbance at the September 2012 Morgan Park-Simeon football game or of other potentially relevant incidents of violence at school sporting events. Although it is true, as the Board points out, that the alleged failure to inform CSU is only relevant to the extent that it affected security at the basketball game, the security affected was that provided by CSU, not the Board. We agree with Ms. Wright-Young that this conduct is "qualitatively different from the conduct traditionally addressed when applying [section] 4-102." The Tort Immunity Act provides various immunities for "specific government functions." *Harrison*, 197 Ill. 2d at 471. In our view, when a public entity negotiates for the use of an off-site venue, hires outside security personnel, and relays necessary information to those individuals, it is not providing police protection services.

¶ 70    The Board also argues that various other immunities apply and we address those in turn, as they relate to this remaining claim.

¶ 71        2. Immunity for the Provision of Information Under Sections 2-107 and 2-210

¶ 72    The Board's primary argument for immunity relative to its providing information to CSU is that sections 2-107 and 2-210 of the Tort Immunity Act immunize it from liability for any failure on its part to inform CSU of prior violent incidents at sporting events. Those sections provide:

"Libel; slander; provision of information

§ 2-107. A local public entity is not liable for injury caused by any action of its employees that is libelous or slanderous or for the provision of information either orally, in writing, by computer or any other electronic transmission, or in a book or other form of library material." 745 ILCS 10/2-107 (West 2012).

\* \* \*

"Negligent misrepresentation; provision of information

§ 2-210. A public employee acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation or the provision of information either orally, in writing, by computer or any other electronic transmission, or in a book or other form of library material." *Id.* § 2-210.

¶ 73 Ms. Wright-Young argues that the Board's failure to provide information does not trigger such immunity because those sections of the Act apply only to the *provision* of information, *i.e.*, libel, slander, or an affirmative misrepresentation. We agree. As with any statute, when interpreting the Act, our "goal is to ascertain and give effect to the intention of the legislature," primarily from the language used. *Barnett v. Zion Park District*, 171 Ill. 2d 378, 388 (1996). Where a provision "is clear and unambiguous, we are not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express." *DeSmet*, 219 Ill. 2d at 510. And because the Act is in derogation of the common law, it is strictly construed against a finding of immunity. *Van Meter*, 207 Ill. 2d at 380. The phrase "provision of information" is used in both the text and the titles of sections 2-107 and 2-210. It would have been a simple matter for the legislature to expressly state that one or both provisions also applies to the omission of relevant information. The Board directs us to

no case construing the sections so broadly, and indeed did not even address this argument in its reply brief. We agree with Ms. Wright-Young that these immunities did not apply here.

¶ 74     The parties also address at length whether these two sections provide immunity for the September 2012 letter Principal Edwards sent to the parents of Morgan Park students. But, as the jury instructions make clear and the parties both conceded at oral argument, that letter was not presented to the jury as an independent basis for the Board's liability. Rather, as we discuss later in this opinion, the letter was the voluntary undertaking that gave rise to the Board's duty to protect Tyrone.

¶ 75                    3. Section 2-201 Immunity for Discretionary Policymaking

¶ 76     The Board also argues that its decision not to inform CSU of prior violent incidents at sporting events was an exercise of its discretion, for which it enjoyed absolute immunity under section 2-201 of the Act, which provides:

> "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2012).

Section 2-109 of the Act extends this immunity to the local public entity the employee works for. *Id.* § 2-109.

¶ 77     To prove discretionary immunity, a defendant "must establish that the act or omission giving rise to the injuries was *both* a determination of policy and an exercise of discretion." (Emphasis added.) *Monson v. City of Danville*, 2018 IL 122486, ¶ 29. Policy determinations are defined as "those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests," and

discretionary decisions are those "unique to a particular public office," which involve "the exercise of personal deliberation and judgment in deciding whether to perform a particular act, or how and in what manner that act should be performed." (Internal quotation marks omitted.) *Id.* ¶ 30. By contrast, a public employee's ministerial acts—for which there is no immunity under the Act—are those done "in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act." (Internal quotation marks omitted.) *Id.*

¶ 78    Here, the Board failed to demonstrate that it was entitled to discretionary immunity under section 2-201 of the Act. As our supreme court has made clear, " '[d]iscretion' connotes a conscious decision." (Internal quotation marks omitted.) *Id.* ¶ 33. Where liability is based on a failure to do something, a local public entity "must present sufficient evidence that it made a conscious decision not to [act]." *Id.* Although the Board insists that "[t]he decision whether to tell CSU officials about any prior acts of violence at school-sponsored events was *** a judgment call [that athletics director Calvin] Davis made" because "in his mind, [those incidents] were minor and insignificant," the testimony at trial simply does not support this assertion. Mr. Davis testified that prior violent incidents were something he believed the security forces for the Board and CSU *would have* discussed in their planning meetings, but Mr. Davis himself did not attend those meetings. He also tried to explain away an e-mail he sent the day after the January 16, 2013, basketball game that referred to "numerous acts of violence outside of basketball contests in the past two weeks," saying those must have only been minor scuffles between students. But at no point did Mr. Davis testify that he or any other Board representative made a conscious decision—based on a balancing of interests or a weighing of factors—not to tell CSU about the incident at the September 2012 Morgan Park-Simeon football game or other prior

incidents of violence at sporting events. Indeed, Mr. Davis could not remember if he had any conversations at all with Mr. Watson, CSU's chief of police, in the weeks leading up to the January 16, 2013, basketball game.

¶ 79    The cases the Board relies on, which we agree all stand for the proposition that a "determination of policy" can include not just the creation of a policy in the first instance, but later decisions regarding how best to implement that policy, all involved anti-bullying policies that schools were statutorily required to establish. See *Castillo*, 2018 IL App (1st) 171053, ¶¶ 16-17; *Mulvey v. Carl Sandburg High* School, 2016 IL App (1st) 151615, ¶¶ 48-49; *Malinski v. Grayslake Community High School District No. 127*, 2014 IL App (2d) 130685, ¶ 13; *Hascall v. Williams*, 2013 IL App (4th) 121131, ¶¶ 26-28. As this court explained in *Castillo*, those policies *mandated* discretionary decisions by school employees regarding whether certain conduct constituted bullying and, if it did, what steps the school should take to intervene. *Castillo*, 2018 IL App (1st) 171053, ¶ 17. The policies also directed school officials to consider a list of specific factors when they made such decisions. *Id.* In such cases, the policy itself constitutes evidence that a discretionary decision was made and provides the court with the factors considered in making it. Here, no such policy was shown to govern the Board's provision of information to vendors, event venues, or outside providers of security at Board-sponsored events.

¶ 80    Where no evidence was presented that that Board made a conscious decision to withhold information about prior acts of violence at sporting events from CSU, let alone what factors may have been considered or competing interests balanced in arriving at such a decision, the trial court did not err when it rejected the Board's claim of section 2-201 discretionary immunity.

¶ 81                                    4. Qualified Immunity

¶ 82    In the trial court, the Board also asserted qualified immunities—under sections 3-108

25

(745 ILCS 10/3-108 (West 2012) (providing qualified immunity for the supervision of an activity or use of any public property)) and 3-106 (*id.* § 3-106 (West 2012) (qualified immunity for injuries caused by a condition of any public property used or intended to be used for recreational purposes), for example—under which it could be found liable only for willful and wanton conduct. We need not decide whether those immunities apply, however, since the jury found that the Board's conduct was willful and wanton. And as discussed below, we reject the Board's argument that the evidence was insufficient to support that finding.

¶ 83                           B. The Board's Other Arguments

¶ 84    The Board makes other arguments about the sufficiency of Ms. Wright-Young's case. We consider whether any of those provide a basis for overturning the jury's verdict to the extent that it could have been based on the one theory on which the Board was not entitled to absolute immunity—that the Board failed to inform CSU of past incidents of violence at sporting events.

¶ 85                                  1. Duty of Care

¶ 86    The Board argues broadly that it had no duty to take any action to protect students attending the basketball game from the criminal acts of a third party. "The determination of whether a duty exists is a matter of law to be made by the trial court and is subject to *de novo* review on appeal." *Wolowinski v. City of Chicago*, 238 Ill. App. 3d 639, 641 (1992). The Board is correct that, as a general rule, "[a]bsent a special relationship," a party has no duty "to warn or protect against the criminal conduct of a third party." *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951, ¶ 33. Our supreme court has recognized four relationships giving rise to such a duty: "common carrier and passenger, innkeeper and guest, custodian and ward, and possessor of land who holds it open to the public and member of the public who enters in response to the possessor's invitation." *Id.*; see also Restatement (Second) of Torts §§ 314, 314A, 315 (1965)).

¶ 87    Ms. Wright-Young alleged in her complaint that Tyrone and the other students at the basketball game were invitees of the Board. Although the Board points out that Tyrone never actually bought a ticket to the basketball game, it does not dispute that the game was open to the public and that students like Tyrone were specifically invited to attend. The Board's primary argument as it relates to this exception is that it "did not own, occupy, manage, operate or in any way control the parking lot where [Tyrone] was shot." In support of this argument the Board cites cases in which courts refused to extend a duty to warn or protect invitees once those invitees left a defendant's property. See *Wilk v. 1951 W. Dickens, Ltd.*, 297 Ill. App. 3d 258, 260, 262-64 (1998) (no liability for a bar whose patron was killed in a street fight a block away); *Lewis v. Razzberries, Inc.*, 222 Ill. App. 3d 843, 850 (1991) (no liability for a bar whose patron was shot to death after returning to a car parked beyond the boundaries of the bar's property); see also Restatement (Second) of Torts § 314A, cmt. c, at 119 (1965) (a possessor of land is under no duty "to one who has ceased to be an invitee").

¶ 88    The Board argues that, under the venue agreement it entered into with CSU for the Morgan Park-Simeon basketball game, it had "contractual possession" of only the arena, with CSU maintaining exclusive control over the parking lot. The Board points to provisions in the venue agreement stating that the "[s]paces utilized" for the basketball game would be the "arena and designated locker rooms" and that CSU would "retain the right to use any portion of the facility not covered by this agreement." The Board also notes that though another provision gave it the option of "buy[ing] the right to control the parking lots," it did not exercise that option. The Board's position is that under the venue agreement, there was a clearly defined division of labor: the Board was responsible for security inside the arena and CSU was responsible for security outside the arena.

27

¶ 89    In our view, the venue agreement did not draw such a clear line between the Board's responsibilities and CSU's. The parking lot buy-out provision, for example, merely allowed for the *cost* of parking—at $5 per vehicle—to be shifted from attendees of the game to the Board. Whether or not the Board chose to exercise that option says nothing about which entity was responsible for providing security in the parking lot. The venue agreement also generally provided that "*[a]ll* facilities" (emphasis added)—including both the arena and the parking lot— would be "at all times *** under the charge and control of [CSU]," and that "*[a]ll* security or other protective service(s) desired by [the Board] [were to] be arranged for and by special agreement with [CSU]" (emphasis added). Addendum B to the venue agreement, titled "Event Concessions," specifically listed the things that the Board and CSU were separately responsible for. Under the heading "CLIENT to provide," it noted that "CPS Security" would "provide staff to cover [the] venue." Nowhere did the addendum state that CSU was separately and exclusively responsible for securing the parking lots outside the JCC arena. Indeed, the overarching tone of the venue agreement is one of an intent to cooperate, with the Board agreeing "to furnish [CSU] with *** information for [the Board's] use of [the arena] no later than four (4) weeks prior to the beginning of the use period," in order "to enable both parties of [the] contract to anticipate and work out in advance any problems that might/can occur relating to [the Board's] use of space(s)."

¶ 90    Although we find the Board's argument that it had no duty to protect Tyrone as an invitee when Tyrone was in the parking lot to be less than persuasive, we ultimately do not need to decide this issue. More compelling, in our view, is the argument Ms. Wright-Young has focused on in this court: that in response to previous incidents of violence at athletic events, the Board voluntarily undertook a duty to increase security efforts for the basketball game and this

voluntary undertaking gave rise to a duty to protect Tyrone while he was on the CSU property to attend the game.

¶ 91    In general, "one who undertakes, gratuitously or for consideration, to render services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care in the performance of the undertaking." (Internal quotation marks omitted.) *Wakulich v. Mraz*, 203 Ill. 2d 223, 241 (2003). Section 323 of the Restatement (Second) of Torts, which our supreme court has cited favorably (*id.* at 243), recognizes such liability in two circumstances: (a) where a "failure to exercise such care increases the risk of harm," or (b) where "harm is suffered because of the other's reliance upon the undertaking" (Restatement (Second) of Torts § 323 (1965)). A parallel provision, section 324A, contemplates a situation where the voluntary undertaking is to protect someone other than the person relying upon the promise of protection. Ms. Wright-Young argues that one or both of these sections apply here because she and Tyrone's father unequivocally testified that, absent the representations in Principal Edwards's letter, they would not have allowed Tyrone to attend the Morgan Park-Simeon basketball game.

¶ 92    Although we do not read Principal Edwards's letter as a guarantee that the basketball game would be a perfectly safe environment, through it the Board undertook a duty, in reaction to at least one past incident of violence, to make future sporting events safer for students. Falling well within the scope of that duty, we believe, was an obligation on the Board's part to disclose to CSU, which it had partnered with to provide security at a high-profile off-campus sporting event just four months later, the reasons that had prompted it to make such representations to parents.

¶ 93    The Board insists that the scope of its undertaking cannot exceed the scope of its contractual obligations under the venue agreement it entered into with CSU. Here, however, the

scope of the undertaking was not based on the contract between the Board and CSU, which of course the parents had no knowledge of, but on the representations made in Principal Edwards's letter, which preceded the venue agreement by several months. The voluntary undertaking in that letter gave rise to a duty.

¶ 94                    2. The Jury's Finding of Willful and Wanton Conduct

¶ 95    The Board also argues that the evidence at trial was insufficient to support the jury's finding that the Board was willful or wanton, which the Act defines as "a course of action which ***, if not intentional, shows an utter indifference to or conscious disregard for the safety of others." 745 ILCS 10/1-210 (West 2012). The Board's arguments in support of this position, however, all relate to the security it provided at the basketball game. The Board makes no argument that the evidence was insufficient to show willful and wanton conduct in reference to its failure to provide information to CSU. We think the evidence was sufficient to sustain the jury's verdict on that theory.

¶ 96    Contrary to the assertion Principal Edwards made in his letter to Morgan Park parents following a violent incident at a September 2012 football game, that "modifications to security plans ha[d] been made in order to maintain a safe environment during sports events," the Board failed to inform CSU of either the incident at the football game or other recent acts of violence at basketball games referenced in Mr. Davis's e-mail to the Board's athletic department just after Tyrone's death. CSU Lieutenant Sharon Robinson said that had she been made aware of such events, she would have discussed them with CSU police chief Ronnie Watson to make sure that violence did not "spill over to the [CSU] campus," and to ensure that "we did have enough people or to see if we wanted to do anything different." When CSU Sergeant Wilbert Norey was asked if, for planning purposes it would have been important to him to have received information

30

about past violence at sporting events between the two schools in advance of the basketball game, he said, "[i]t would have been important to all of us, yes," because such information could have impacted their efforts to keep fans at the game safe.

¶ 97     And Ms. Wright-Young's school safety expert James Bondi opined, based on the accounts given by Lieutenant Robinson and Officer Norey, that there was "little coordination between [the Board] and [CSU]" and the "lack of coordination and communication ahead of time definitely [was] something that led up to the crisis." Given what the Board knew about the publicity the game was generating, the unusually large crowd expected to attend, the rivalry between the two teams, the prior incident at the football game, and the other unspecified "acts of violence at basketball games" referenced in Mr. Davis's e-mail, Mr. Bondi believed that the Board "should have been aware of the elevated level and potential for violence" and should have communicated those concerns to CSU. In his view, the CSU officers "expected to have a comparable event from years past, so they just cookie-cut the number of staff and planning that they had done in years past"; they "just posted the same number of people and did everything exactly like they did in years past."

¶ 98     Based on this evidence, a finding that the Board was willful and wanton in its failure to inform CSU of information necessary for the adequate provision of security at the basketball game would not have been against the manifest weight of the evidence. See *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992) ("A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence." (Internal quotation marks omitted.)).

¶ 99                                    3. Causation

¶ 100   The Board also argues, for the first time in its supplemental brief, that the evidence at

31

trial was insufficient to establish that the Board's conduct was a proximate cause of Tyrone's death. The Board contends that no evidence was presented regarding what specific actions CSU would have taken if it had been better informed about prior incidents of violence at sporting events. Although it acknowledges that this case "is obviously not a medical malpractice case," the Board insists that "security planning and crime prevention, like medicine, are not within the ken of the average juror." It cites no authority for this proposition, and, because the parties' supplemental briefs were filed simultaneously, we lack the benefit of any contrary argument Ms. Wright-Young might have made if the issue had been raised sooner. We decline to address this argument.

¶ 101   The purpose of the supplemental briefing requested by this court was to allow the parties to address what should be done if this court were to hold—as we now do—that although some theories of liability presented at trial were legally defective, at least one was a proper basis on which the jury could have based its verdict. Rather than answer that question, the Board held firm to its position that *all* theories were defective and even raised a completely new causation argument in support of that position. This argument belonged in the Board's opening brief. Failing to appear there, it is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 102                              4. Special Interrogatories

¶ 103   As an alternative to reversal, the Board argues that it is entitled to a new trial because the trial court refused to give two of the special interrogatories that it requested, which asked (1) whether Mr. Davis or a member of his staff held positions within the Board's sports administration department "in which they exercised discretion or made policy decisions about

32

whether and how to provide security" at the basketball game and (2) whether the Board was "providing police protection services by staffing security officers inside of the [JCC arena]" during the game. We conclude that these interrogatories were properly rejected.

¶ 104 A special interrogatory is appropriate only where an affirmative answer would necessarily be inconsistent with a general verdict the jury might reach. See *Simmons v. Garces*, 198 Ill. 2d 541, 555-56 (2002) ("[s]pecial findings are inconsistent with a general verdict only where they are clearly and absolutely irreconcilable with the general verdict" (internal quotation marks omitted)). Here, because neither proposed interrogatory would negate liability based on the Board's failure to provide information to CSU, the court's refusal to submit them to the jury does not entitle the Board to a new trial.

¶ 105                                    C. The General Verdict Rule

¶ 106 Of course, we do not know that the Board's failure to provide information to CSU was the specific basis on which the jury's finding of liability rested. Having determined that the Board was immune from liability with respect to five of the six theories of liability presented at trial—but finding no error if the jury's verdict was based on the sixth theory—we must decide whether the jury's verdict should be allowed to stand.

¶ 107 Section 2-1201(d) of the Code of Civil Procedure provides that "[i]f several grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict." 735 ILCS 5/2-1201(d) (West 2016). This is a codification of the common law general verdict rule (see *Moore v. Jewel Tea Co.*, 46 Ill. 2d 288, 294 (1970) (noting, nearly 50 years ago, that the rule was "settled law")) or, as it is referred to by some courts, the "two issue rule" (see, *e.g.*, *Strino v.*

*Premier Healthcare Associates, P.C.*, 365 Ill. App. 3d 895, 904 (2006)). Having reviewed the supplemental briefing we asked the parties to submit on this issue, we agree with Ms. Wright-Young that the general verdict rule applies here and requires us to affirm the jury verdict. As the authorities she cites demonstrate, courts have applied the rule broadly, against both plaintiffs and defendants, and in cases involving just two possible bases for the jury's general verdict or several. See, *e.g.*, *Witherell v. Weimer*, 118 Ill. 2d 321, 329, 339 (1987) (general verdict for the plaintiff; two theories); *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 492 (2002) (general verdict for the plaintiff; several theories); *Strino*, 365 Ill. App. 3d at 904-05 (general verdict for the defendant; two theories).

¶ 108    The Board's only argument for why the general verdict rule should not apply is that it was prejudiced by an "avalanche of highly prejudicial evidence" relating to its failure to provide adequate security at the basketball game, a theory of liability that should never have been presented to the jury. Although we agree that this was unfortunate, the general verdict rule *presupposes* that a jury will have heard evidence it should not have. Section 1201(d) expressly applies when *several* grounds of recovery are advanced at trial and even *one* is legally sound and supported by the evidence. 735 ILCS 5/2-1201(d) (West 2016)). By enacting it, the legislature clearly prioritized the upholding of jury verdicts, wherever possible, over the prejudice a losing party may have suffered as a result of a jury's exposure to evidence relating to legally defective or insufficiently supported theories. This is a priority long shared by courts. See *Kessling v. United States Cheerleaders Ass'n*, 274 Ill. App. 3d 776, 779-80 (1995) (noting that when determining whether an inconsistency exists between a jury's special finding and its general verdict, "all reasonable presumptions must be exercised in favor of the general verdict"). Even if we were inclined to do so, we have no authority to read into section 2-1201(d) exceptions or

limitations not contemplated by its drafters. See *Bellfield v. Coop*, 8 Ill. 2d 293, 307 (1956) ("The only legitimate function of the courts is to declare and enforce the law as enacted" and "not to annex new provisions or substitute different ones, or read into a statute exceptions, limitations, or conditions which depart from its plain meaning."). The jury's general verdict in favor of Ms. Wright-Young will stand.

¶ 109                                    IV. CONCLUSION

¶ 110   For the reasons stated above, we affirm the trial court's judgment on the jury's verdict against the Board and in favor of Ms. Wright-Young.

Affirmed.

---

**No. 1-18-1073**

---

| | |
|---|---|
| **Cite as:** | *Wright-Young v. Chicago State University*, 2019 IL App (1st) 181073 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-L-488; the Hon. Thomas J. Lipscomb, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Joshua G. Vincent, Steven M. Puiszis, and Carson R. Griffis, of Hinshaw & Culbertson LLP, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Michael W. Rathsack, Martin S. Dolan, Karen Munoz, and John M. Carmody, of Chicago, for appellee. |

---