2022 IL App (1st) 181887

FIRST DISTRICT
SIXTH DIVISION
April 8, 2022

No. 1-18-1887

| | | |
|---|---|---|
| JESSE PEREZ, as Independent Executor of the Estate of Marilyn Medina Perez, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| ST. ALEXIUS MEDICAL CENTER, an Illinois Corporation; JEFFREY E. CHUNG, M.D.; MIDSUBURBAN RADIOLOGICAL CONSULTANTS OF WOODSTOCK, LTD; CHRISTOPHER MICHAEL, M.D.; BRAD L. EPSTEIN, M.D.; SUBURBAN WOMEN'S HEALTH SPECIALIST, LTD.; DONALD R. TAYLOR, D.O.; SUBURBAN MATERNAL FETAL MEDICINE, LLC; VISHVANATH C. KARANDE, M.D.; and KARANDE AND ASSOCIATES, S.C., | ) ) ) ) ) ) ) ) ) ) ) | No. 14 L 10905 |
| Defendants | ) ) ) | Honorable |
| (St. Alexius Medical Center and Jeffrey E. Chung, M.D., Defendants-Appellees). | ) ) | Edward S. Harmening Judge, Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Mikva and Connors concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff, Jesse Perez (Jesse), as independent executor of the Estate of Marilyn Medina Perez, deceased, appeals a judgment following a jury trial for defendants St. Alexius Medical Center (St. Alexius) and Jeffrey Chung, M.D. Plaintiff also appeals trial court orders striking his petition for adjudication of criminal contempt against Chung and denying his motion to amend his posttrial motion to incorporate a perjury allegation from his contempt petition.

¶ 2      On appeal, plaintiff contends that (1) the jury's finding that Chung was not the apparent agent of St. Alexius was against the manifest weight of the evidence and the court erred by refusing to give jury instructions submitted by plaintiff related to apparent agency; (2) the court erred by barring plaintiff from using Chung's Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018) disclosure against defendants as an evidentiary admission and as impeachment; (3) the court erred by allowing defendants' expert to use certain images during his testimony even though defendants did not disclose them until the morning of the expert's testimony; (4) the court erred by barring plaintiff from cross-examining Chung with the American College of Radiology (ACR) practice guideline; (5) the cumulative effects of these errors denied plaintiff a fair trial and warrants a new trial; and (6) the court erred by dismissing plaintiff's petition for adjudication of criminal contempt against Chung and by denying plaintiff's posttrial motion to include the allegations of perjury in the petition. Defendants contend that the two-issue rule precludes plaintiff from establishing reversible error. For the reasons stated below, we affirm.[1]

¶ 3                                    I. JURISDICTION

¶ 4      In 2014, plaintiff brought this civil action against various defendants including Chung, St. Alexius, Dr. Christopher Michael, M.D., and Suburban Women's Health Specialists, Ltd. (Suburban). At trial, the jury considered claims against only Chung, Michael, St. Alexius, and Suburban. On May 21, 2018, the jury issued verdicts in favor of Chung and St. Alexius against plaintiff and in favor of plaintiff against Michael and Suburban. The court entered judgment on the verdicts for Chung and St. Alexius that day and entered judgment regarding Michael and Suburban on May 29, 2018. Plaintiff filed his posttrial motion on June 18, 2018, and later filed his

---

[1]We initially issued an opinion vacating the judgment and remanding for a new trial. However, defendants have timely filed petitions for rehearing. Following briefing on the petitions, we granted rehearing, withdrew the previous opinion, and now issue this opinion.

petition to adjudicate Chung in criminal contempt and motion to amend his posttrial motion. The court struck the contempt petition and then denied the posttrial motion and the motion to amend on August 28, 2018. Plaintiff filed his notice of appeal on August 31, 2018. Accordingly, we have jurisdiction here pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017).

¶ 5                                II. BACKGROUND

¶ 6      This is a wrongful death and survival action raising medical malpractice claims regarding Marilyn Perez (Marilyn), who died from metastatic pelvic abdominal cancer about seven months after she gave birth to twins by caesarean section. The cancer, discovered during the June 2013 cesarean section, originated from a teratoma on her left ovary that ruptured in May 2013. Plaintiff brought suit against various defendants including physicians who treated Marilyn before and during her pregnancy. The case went to a jury trial against Michael, an obstetrician-gynecologist involved in her treatment; Suburban, Michael's medical practice; Chung, the radiologist who interpreted Marilyn's ultrasound when she came into St. Alexius's emergency room on August 11, 2012; and St. Alexius under an apparent agency theory. The jury returned verdicts in favor of plaintiff against Michael and Suburban for $25 million. It returned verdicts for Chung and St. Alexius, finding that Chung was not an apparent agent of St. Alexius. Shortly after trial, the court dismissed Michael and Suburban from the case with prejudice based on a $1 million settlement. This appeal thus concerns only the verdicts and the rulings regarding Chung and St. Alexius.

¶ 7                                A. Teratoma

¶ 8      Various experts testified about teratomas, which arise in ovaries and can contain such matter as fat, teeth, hair, or eyeballs. When a teratoma increases in size, it can cause the ovary to twist and thus compromise the ovary's blood supply. The risk of a teratoma rupturing, spilling its

3

contents into the pelvis and abdomen, also increases as the mass gets larger. A mature teratoma is generally benign but with a 0.2 to 2% chance of transforming into a malignant teratoma.

¶ 9    A computed tomography (CT) scan is considered one of the best radiological methods to diagnose a teratoma and is superior to an ultrasound for that purpose. A CT scan has much better sensitivity and provides a better picture and more detail than an ultrasound. Air or matter in a person's bowel can obscure sound waves and make it difficult to identify structures and visualize a teratoma on an ultrasound.

¶ 10                                B. Overview of Timeline

¶ 11    Michael, Marilyn's primary obstetrician-gynecologist, referred her in September 2011 to Dr. Vishvanath Karande, an obstetrician-gynecologist and fertility specialist, for fertility treatment and *in vitro* fertilization.

¶ 12    On August 11, 2012, Marilyn went to the St. Alexius emergency room with pelvic pain, and emergency room physician Dr. Al Sarraj ordered a CT scan and ultrasound. Dr. Gregory Gullo read the CT scan and reported a teratoma on Marilyn's left ovary. Chung interpreted the ultrasound and reported that Marilyn's ovaries were "unremarkable" and there was "[n]o adnexal mass seen." Chung did not refer to the CT report or a teratoma in his report.

¶ 13    Michael saw Marilyn five days after her emergency room visit and reviewed the CT report, which identified the teratoma, and the ultrasound report, which did not refer to a teratoma. He also examined her and found an enlarged uterus, which he found consistent with fibroids, and no adnexal abnormalities. Michael concluded that Marilyn did not have a teratoma. Marilyn proceeded with *in vitro* fertilization treatments and became pregnant with twins after Karande implanted embryos in December 2012.

¶ 14    On March 8, 2013, Marilyn went to St. Alexius for abdominal pain and had an appendectomy after showing symptoms consistent with appendicitis. On March 13, 2013, she was admitted to St. Alexius for the same abdominal pain. A CT scan of Marilyn's pelvis taken that day showed she had a teratoma. Additional pregnancy ultrasounds, looking at the same area as a pelvic ultrasound, were taken in March 2013 and the physicians interpreting these ultrasounds did not identify the teratoma on the ultrasounds.

¶ 15    On May 3, 2013, Marilyn was admitted to St. Alexius for acute onset abdominal pain. Plaintiff's expert Dr. Marcela Guadalupe DelCarmen testified that the teratoma had ruptured at that time, causing the contents of the teratoma to leak. That leakage in turn caused Marilyn "stabbing abdominal pain" and tenderness and caused metastatic cancer to spread. During Marilyn's caesarian section on June 21, 2013, the ruptured teratoma was removed. On January 15, 2014, Marilyn died as a result of metastatic cancer from the teratoma.

¶ 16                                C. Emergency Room Consent Form

¶ 17    On August 11, 2012, Marilyn's husband, Jesse, took her to the St. Alexius emergency room because she had severe pelvic pain. They chose St. Alexius as it was near their home, had a "very good reputation," and "was like a one-stop shop, *** any service you need was available there." They had gone to St. Alexius's emergency room about a year earlier due to the flu.

¶ 18    Jesse testified about the circumstances around Marilyn's execution of the consent form during the visit. As Marilyn was in the examination room, a woman came in and told Marilyn that she had "to sign here, here, here." The woman did not explain the form and was in the room for "[n]ot even a minute." Jesse acknowledged that Marilyn's signature was on the form, a one-page document entitled "Consent for Medical Treatment." The second section on the form contained an "Authorization to Release Information" section, which stated in the second paragraph:

5

"*INDEPENDENT STATUS OF PHYSICIANS*: I recognize that any or all physicians, residents, or medical students (under the supervision of physicians and/or residents), who furnish services to me during this admission are INDEPENDENT CONTRACTORS and are NOT AGENTS OR EMPLOYEES OF THE HOSPITAL." (Emphasis in original.)

Jesse acknowledged that Marilyn had a PhD and was detail-oriented. He could not recall whether Marilyn expressed any confusion about signing the form. Neither Marilyn nor Jesse met Chung, had heard of him before that day, or had chosen him to read Marilyn's ultrasound.

¶ 19                    D. CT and Ultrasound Reports of August 11, 2012

¶ 20    Emergency room physician Sarraj ordered a CT scan of Marilyn's abdomen and pelvis. Gullo, a general diagnostic radiologist at St. Alexius, reviewed the CT scan and signed his report at 2:29 p.m. He reported that the CT scan showed that Marilyn had multiple fibroids and a teratoma above the uterus about the size of a softball, 7 by 6.3 centimeters.

¶ 21    Sarraj ordered an ultrasound of Marilyn's pelvis due to her pelvic pain. Plaintiff's expert DelCarmen testified that Sarraj's deposition testimony showed he ordered the ultrasound "not to confirm the teratoma" but "to determine whether there was appropriate blood flow" to the ovaries to check they were not twisted, which would require emergency surgery. Plaintiff's expert Dr. Richard Gore also testified that Sarraj ordered the ultrasound to examine blood flow to the ovary.

¶ 22    Chung interpreted the ultrasound images and signed his report at 4:56 p.m. Chung reported that Marilyn had five fibroids, the left ovary was "unremarkable," there was "[n]o adnexal mass seen," and the ultrasound confirmed that there was adequate blood flow to both ovaries. Chung's report stated "Comparison: None," meaning that he did not conduct any comparison examinations.

¶ 23    Sarraj told Jesse and Marilyn that Marilyn had a teratoma that should be removed. He initially wanted to admit her to the hospital but ultimately discharged her with instructions to follow up with Michael.

¶ 24                                    E. Karande's Testimony

¶ 25    Marilyn began seeing Karande in October 2011 for fertility treatments and was implanted with embryos in December 2012. Under Karande's care, Marilyn's ovaries were always normal, including at the time of implantation. Karande never had a reason to think that Marilyn had a teratoma. Had Karande known she had a teratoma larger than two centimeters, he would not have proceeded with *in vitro* fertilization but would have sent her to Michael for further evaluation.

¶ 26                                    F. Michael's Testimony

¶ 27    Michael was Marilyn's obstetrician and saw her on August 16, 2012, five days after her emergency room visit. Michael had the August 11 CT report that showed a fat density pattern consistent with a teratoma and the August 11 ultrasound report that indicated Marilyn's ovaries were normal. Michael concluded that Marilyn's ovaries were normal because the ultrasound report indicated "normal ovaries." Michael also examined Marilyn and found an enlarged uterus, which he considered consistent with fibroids, and no adnexal abnormalities. Based on Chung's ultrasound report, Michael concluded that Marilyn did not have a teratoma, as teratomas come from ovaries and she could not have a normal ovary with a teratoma. Relying on Chung's report, Michael told Marilyn that she did not need surgery to remove a teratoma and could continue with *in vitro* fertilization.

¶ 28    Michael did not think there was a discrepancy between the CT and ultrasound reports because the calcium and fat pattern description of a teratoma, as indicated in the CT report, could also be consistent with fibroids. Michael did not communicate with Chung or Gullo. In August

2012, Michael knew that a CT test was a more definitive test than an ultrasound to diagnose a teratoma. If a patient had a seven-centimeter teratoma and wanted to get pregnant, the standard of care required Michael to recommend removing the teratoma.

¶ 29                                    G. Chung's Testimony

¶ 30    Chung testified that he was a board-certified diagnostic radiologist who was a partner at, and employed by, Midsuburban Radiological Associates, LLC. He was not an employee of St. Alexius. St. Alexius gave him privileges to work in its radiology department—he was on the medical staff and permitted to practice his specialty there—and St. Alexius could revoke his privileges. Chung testified that St. Alexius did not hire him, could not fire him, and did not control his practice. He had to adhere to a work rotation rather than working when he pleased. He was required to use his own medical judgment. St. Alexius supplied Chung's workspace; all equipment including computers, furniture, and radiology equipment; and the scans he interpreted.

¶ 31    On August 11, 2012, St. Alexius assigned Chung to review Marilyn's pelvic ultrasound. He never met Marilyn or Jesse, and his ultrasound interpretation was his only involvement with Marilyn. He reviewed about 100 different studies on that day and had no independent memory of Marilyn's case, so he testified based on his general memory of his custom and practice.

¶ 32    Sarraj ordered the ultrasound for Marilyn because she had pelvic pain. Chung looked at Marilyn's ultrasound images to determine whether there was consistent blood flow to both ovaries. Chung's ultrasound report indicated "left ovary unremarkable" and that Marilyn had five fibroids. He indicated "Comparison: None," meaning that he did not look at a comparison examination. Chung could not remember whether he looked at that day's CT scan when he interpreted Marilyn's ultrasound. If he had reviewed the CT report, he would have documented it in his ultrasound report. He did not see any signs of a teratoma on Marilyn's August 11 ultrasound.

¶ 33     Chung knew that other physicians treating Marilyn would rely on his report. On the day of trial, he still did not think his report was wrong. He did not see an ovarian mass, and there was clear evidence that Marilyn had multiple fibroids. He testified that the standard of care for a radiologist was to compare relevant exams, in this case, other pelvic ultrasounds. If he "had any questions or needed more information or both, then I think the standard would require me to look beyond that into other modalities or other examinations as well." He did not have any questions with Marilyn's ultrasound report that would have caused him to look to a CT scan for comparison.

¶ 34     Chung also testified that if he had been aware of the CT scan, it would have been his custom and practice to review it as part of his ultrasound interpretation. Plaintiff's counsel played a video of Chung's deposition testimony with the following colloquy:

> "Q. So when you were looking at these images of this ultrasound, were you doing so with the teratoma in mind that you knew was identified on the CT from two hours earlier?
>
> A. Well, to answer the question, yes, but that's not the only thing I'd be concerned about or looking at or trying to evaluate."

¶ 35     St. Alexius had a computerized record system that allowed Chung to access the CT and ultrasound images. When Chung reviewed an ultrasound in the system, previous ultrasound examinations automatically populated. While other comparison studies such as a CT scan did not automatically populate, he could search the system to find them. However, Chung had no reason to search the system for other comparison studies. He had the technologist's worksheet when he reviewed the ultrasound, using it to obtain Marilyn's clinical history and the reason for the examination, but it did not show that a CT scan had been performed that day.

¶ 36 At trial, Chung identified an "order form" or "requisition form" that the technologist received from the emergency room physician. The form showed previous examinations performed on Marilyn, including the August 11 CT scan. However, Chung did not look at this document or use it when he interpreted the images. Based on his background and experience, it was his opinion that his interpretation of the August 11, 2012, ultrasound complied with the standard of care. The ultrasound interpretation and report did not negate the findings of the CT scan.

¶ 37                     H. Expert Testimony

¶ 38                         1. Gore

¶ 39 Gore, a diagnostic radiologist and medical school professor, testified as an expert for plaintiff regarding the standard of care for Chung's ultrasound interpretation of August 11, 2012. The CT report and images from that day showed that Marilyn had a 7 by 6.3 centimeter sized teratoma. Gore identified the teratoma in the August 11 ultrasound without having the CT report and did not see a normal left ovary in the ultrasound images. He also testified that he knew "what the mass is because I do have the CT."

¶ 40 Gore testified that the standard of care required Chung to review the CT images next to the ultrasound images. Gore was an ACR fellow, and the ACR practice guideline for communication of diagnostic imaging findings supported his opinions regarding the standard of care. The guideline provided that, when there is a previous exam of the same body part, the radiologist should compare the "current exam with the older exam if it's available and the same body part." The ACR guideline stated that it was not intended to establish a legal standard of care and cautioned against its use in litigation but also suggested that a radiologist taking a substantially different approach from the guideline explain or document why in the medical record. Gore considered the guideline "a good, safe, prudent standard medical practice, radiology practice."

¶ 41    Chung had testified in his deposition that it was his custom and practice, as well as the standard of care, to look at prior examinations of the same body part. Gore testified that Chung violated the standard of care by not mentioning the teratoma identified on the August 11 CT report as a comparison study in his ultrasound report and by describing both ovaries as unremarkable in his report. If Chung had been aware of the CT showing the teratoma, he should have stated so in his ultrasound report. If he did not review the CT, he should have found the CT report and included it in his ultrasound report.

¶ 42    When Chung was preparing his August 11 ultrasound report, the CT scan performed earlier that day did not automatically populate in the system to show that it had been performed, but the requisition form in the system showed that the CT scan was available for a comparison study. Gore acknowledged that the teratoma diagnosis on the CT report remained valid regardless of Chung's ultrasound report. He also acknowledged that ultrasound reports prepared by other physicians in March 2013 did not indicate that Marilyn had a large ovarian teratoma. The first time any physician described a problem with Marilyn's left ovary based on an ultrasound was on April 15, 2013.

¶ 43                                    2. Dr. Davide Bova

¶ 44    Dr. Davide Bova, a board-certified radiologist and former head of the Chicago Radiological Society, testified as an expert for St. Alexius and Chung. It was Bova's opinion that Chung complied with the standard of care when he interpreted and reported on the August 11, 2012, ultrasound images. Bova agreed with Chung's ultrasound report findings and testified that, from his review of the ultrasound images, there was evidence of an unremarkable left ovary and that there was no adnexal mass, teratoma, or any significant ovarian mass. Chung complied with the standard of care when he did not compare the CT scan with the ultrasound because they look at different structures and diseases. There were "no elements" in the ultrasound images that would

have prompted Chung to look for another study, and there was no reason for Chung to reference the CT or teratoma in his ultrasound report.

¶ 45    Plaintiff's counsel examined Bova regarding Chung's deposition testimony. Chung had testified that his "standard practice would be to look at the CT examination in conjunction with the ultrasound" and he did not report the teratoma in his ultrasound report because it would have been redundant. Plaintiff's counsel also asked Bova about Chung's initial Rule 213(f) disclosure:

> "Q. Fourth paragraph: 'Dr. Chung will further testify that based on his custom and practice, he would have reviewed the CT scan and reports from August 11, 2012, and would have been aware of Dr. Gullo's finding of the teratoma. Further, he will testify that it was also his custom and practice to compare the ultrasound to the CT at that time. He will testify that even though the report states there was no comparison, it was his custom and practice to compare the films and likely did so in 2012.' Did I read that correctly?
>
> A.  Yes, sir."

¶ 46    During Bova's testimony, he used a PowerPoint exhibit that included sagittal or side view images he reconstructed from the CT images taken on August 11, 2012. To create the new images, Bova used a software program that was "freeware downloadable from the internet." Chung did not have the sagittal images when he interpreted the ultrasound images on August 11, 2012. Plaintiff's counsel objected to Bova's use of the sagittal images based on Rule 213(f), noting that they were not disclosed to plaintiff until the morning of Bova's testimony. The court overruled plaintiff's objection, finding that they were being used as demonstrative exhibits. Using one of the sagittal images, Bova testified that the teratoma was located "immediately above the field of view" of the ultrasound images. The teratoma "was big enough that it pushed itself outside of the pelvis, and,

therefore, was never in the field of view." In every ultrasound taken from October 2011 to April 2013, Bova did not see a teratoma, as it was always outside the field of view.

¶ 47                                    3. DelCarmen

¶ 48    DelCarmen, a professor and board-certified physician in obstetrics, gynecology, and gynecologic oncology, testified as an expert for plaintiff. The August 11, 2012, CT report showed that Marilyn had a 7 by 6.3 centimeter teratoma on her left ovary. Given the size of the teratoma, Marilyn probably had it for years. An ovary with a "tennis-sized" ball teratoma attached was not normal or "unremarkable." On cross-examination, DelCarmen acknowledged that, even with a growing teratoma, the ovary could be documented as "normal" on an ultrasound.

¶ 49    According to DelCarmen's review of the record, Michael relied on Chung's ultrasound report in concluding that Marilyn did not have a teratoma. DelCarmen testified that Michael's reliance was a proximate cause of Marilyn developing metastatic cancer; if the teratoma had been removed in August 2012, she would not have developed cancer. Asked how a seven-centimeter teratoma could attach to a two-centimeter ovary, DelCarmen explained that an ovary expands when there is a growth on it. "You can blow a bubble but still have a little bit of gum left in your mouth. *** so normal ovary, and then an expansion essentially around it of also ovarian tissue that forms the cyst, but still have a part of that ovary that looks normal on either visual inspection or by imaging." The August 11 ultrasound did not negate the finding of the teratoma on the CT scan.

¶ 50                            4. Dr. Yvonne Gomez-Carrion

¶ 51    Dr. Yvonne Gomez-Carrion, a physician board-certified in obstetrics and gynecology, testified as an expert for plaintiff. She reviewed the August 11 CT report and identified a 7 by 6.3 centimeter teratoma on Marilyn's left ovary. Gomez-Carrion reviewed the August 11 ultrasound report and could "not clearly" identify a left ovary. She testified that Michael violated the standard

of care by failing to, by contacting a radiologist or in some other manner, resolve the difference between the August 11 CT report identifying a seven-centimeter teratoma and the August 11 ultrasound report that Marilyn had "normal ovaries." She testified that Michael also violated the standard of care by failing to inform Karande that the CT report showed Marilyn had a teratoma. Michael's violations of the standard of care were proximate causes of Marilyn's death.

¶ 52                                5. Dr. Linda Holt

¶ 53    Dr. Linda Holt, a physician specializing in obstetrics and gynecology, testified as an expert for Michael. An ultrasound is "considered the first line evaluation and the standard evaluation for imaging ovaries." She testified that Michael complied with the standard of care. It was appropriate for him to rely on the CT and ultrasound reports and to conclude that Marilyn did not have a teratoma on August 16, 2012, because a teratoma would have made "the ovaries look abnormal."

¶ 54                                I. Jury Instructions

¶ 55    Illinois Pattern Jury Instructions, Civil, No. 105.10 (2011) (hereinafter IPI Civil (2011) No. 105.10) is the burden of proof instruction for claims based on apparent agency. Plaintiff submitted a modified jury instruction to add the words "or agent" to the IPI Civil (2011) No. 105.10 pattern instruction:

> "First, that St. Alexius held itself out as a provider of complete radiology care and that Marilyn Perez neither knew nor should have known that Dr. Chung was not an employee *or agent* of St. Alexius." (Emphasis added.)

The court refused plaintiff's modified instruction and gave unmodified IPI Civil (2011) No. 105.10 to the jury:

14

"First, that St. Alexius Medical Center held itself out as a provider of radiological care and that Marilyn Perez neither knew or nor should have known that Dr. Jeffrey Chung, M.D. was not an employee of St. Alexius Medical Center."

The trial court also refused plaintiff's request to give IPI Civil (2011) No. 50.10, entitled "Agent or Independent Contractor."

¶ 56    The jury was instructed pursuant to IPI Civil (2011) No. 15.01 that proximate cause is "a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury." The jury was also instructed pursuant to IPI Civil (2011) No. 12.04 that:

"More than one person may be to blame for causing an injury. If you decide that a defendant was negligent and that his negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant."

¶ 57                            J. Verdicts and Posttrial Motions

¶ 58    During closing arguments, counsel for St. Alexius argued in part:

"Not only do you have to decide if Dr. Chung was reasonably careful. If you all decide he was reasonably careful, your discussion is over. He wins his case. But if somebody said, well, no, I think maybe he should have done something different and he didn't act carefully, well then you still have to decide did his conduct, anything that he did—allegedly did wrong—is that a cause of why she was injured and died?"

"However, if you decide that the sole proximate cause of the injury—the sole reason she got cancer and died—was the conduct of some person other than the defendant, your verdict should be for the defendant. So *** in your consideration of the evidence, if you think any of those people, *** it's their conduct which was the reason why this all happened and why her injury occurred, under this instruction your verdict is for all the defendants."

Counsel for St. Alexius also argued: "If you all say, hey, I think somebody else is the reason for this, then this instruction would apply. And then the verdict would be for the defense." Similarly, Chung's counsel argued in part:

"So, I want to talk to you a little bit about proximate cause as well. *** I'm not going to restate everything, but the Plaintiff also has to show, not just that Dr. Chung failed to act as a reasonably careful radiologist, but that also that somehow those actions were a proximate cause, a cause of Mrs. Perez'[s] injury and death.

And I'm going to start back again with Dr. Gomez-Carrion because she is the OB expert for the plaintiff, I'm going to remind you. And she says that obstetricians use radiologist studies, imaging studies as a guide. After that August 16th date that Dr. Michael saw Ms. Perez after the emergency room visit, all of the care providers that were involved with Mrs. Perez'[s] care, when they were making decisions about the teratoma, when they had knowledge of it in March, they all had many more additional studies, much more information available to them. They are making decisions based on information that they had outside of and in addition to that August 11th, 2012 ultrasound that Dr. Chung reviewed.

So, Dr. Chung's ultrasound interpretation really has no relationship to anything that happened in March because they had so much more information at that time, it was not a contributing factor at all.

So, that's why I just want to focus on Dr. Michael's office visit. And please do not infer that I am saying, right now, that Dr. Michael did anything inappropriate at all. I tell you that you have heard evidence in this case *** that Dr. Michael made the appropriate decisions and acted as a reasonably careful obstetrician in his treatment of Ms. Perez.

So, what I will and I do want you to think about, though, is Dr. Michael himself testified in August of 2012, he knew that a CT scan was the better radiology modality to make a diagnosis of a teratoma. And he also told you that he had looked at CT scan reports, he had an ultrasound reports, and then he did a physical exam of Ms. Perez that day. And on his physical exam, he felt the adnexa. He found there was no pain complaints and he did not find any evidence of a mass.

So, it was the totality of that information, along with his own background, training and experience, that he used to make the treatment decision and the recommendation that day.

Dr. Chung's ultrasound interpretation was not, based upon the evidence that you've heard, the proximate cause of any injuries or the death of Marilyn Perez."

¶ 59 The jury returned a verdict in favor of plaintiff against Michael and Suburban for $25 million. The jury returned a verdict in favor of defendants Chung and St. Alexius against plaintiff, expressly finding that Chung was not the apparent agent of St. Alexius. After trial, pursuant to a settlement for $1 million, the court dismissed Michael and Suburban as defendants with prejudice.

¶ 60 The court denied plaintiff's posttrial motion and his motion to amend his posttrial motion. The court also struck plaintiff's "Verified Local Rule 23.9 Petition to Issue Rule to Show Cause"

against Chung. The allegation that plaintiff raised in his contempt petition and wanted to add to his posttrial motion was that Chung committed perjury because his testimony in another case (Estate of Newberry v. Iza, No. 14 L 7734 (Cir. Ct. Cook County)), after the trial herein, regarding his use of St. Alexius's "requisition forms" completely contradicted his testimony here. Specifically, Chung allegedly testified in the other case that, in interpreting ultrasounds, he reviewed the requisition forms referencing the patient's previous examinations, while in this case he testified that he never looked at the form when interpreting ultrasound images. This appeal followed. Upon granting defendants' petitions for rehearing, the previous opinion of August 28, 2020, was withdrawn.

¶ 61                                    III. ANALYSIS

¶ 62     On appeal, plaintiff contends that the jury's finding that Chung was not the apparent agent of St. Alexius was against the manifest weight of the evidence. He contends that the trial court erred by refusing to give his modified jury instruction IPI Civil (2011) No. 105.10 and IPI Civil (2011) No. 50.10. He contends that the court erred by barring him from using Chung's Rule 213(f) disclosure, by barring him from examining Chung with the ACR practice guideline, and by allowing Bova to use certain images during his testimony even though defendants did not disclose them until the morning of Bova's testimony. Plaintiff also contends that the cumulative effects of the court's errors denied him a fair trial and warrants a new trial against both defendants. Lastly, he contends that the court erred by striking his petition for adjudication of criminal contempt against Chung and by denying his motion to amend his posttrial motion to include his perjury allegation. Defendants contend that the two-issue rule precludes plaintiff from establishing reversible error.

¶ 63 This case is before us now on defendants' petitions for rehearing and the briefing thereon. As a threshold matter, we find that the petitions were timely filed. Illinois Supreme Court Rule 367(a) (eff. Nov. 1, 2017) provides 21 days to file a petition for rehearing. However, the supreme court provided temporarily in 2020 (Ill. S. Ct., M.R. 30370 (eff. Mar. 24, 2020)) that the filing period for a rehearing petition was 42 days due to COVID-19, and when it vacated that provision (Ill. S. Ct., M.R. 30370 (eff. Sept. 1, 2020)), it did so strictly prospectively: "Any deadline set *** in accordance with the above referenced orders prior to the effective date of this Order shall remain in effect." Thus, the rehearing period for the opinion of August 28, 2020, was 42 days and had not expired when defendants filed their petitions on October 8, 2020.

¶ 64 We shall first consider defendants' contention that the two-issue or general verdict rule precludes plaintiff from establishing reversible error. That rule provides that a general verdict for the plaintiffs or the defendants without special interrogatories will not be disturbed if the case involved two or more determinative issues, or two or more theories were presented, and there was sufficient evidence to support at least one of the issues or theories that was free from prejudicial error. *Allen v. Sarah Bush Lincoln Health Center*, 2021 IL App (4th) 200360, ¶¶ 120-22; *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 51; *Arient v. Alhaj-Hussein*, 2017 IL App (1st) 162369, ¶ 44. In other words, where multiple claims, theories, or defenses were raised, a general verdict creates a presumption that the jury found in favor of the victorious party on every claim, theory, or defense raised. *Allen*, 2021 IL App (4th) 200360, ¶ 121. Where multiple theories or defenses are raised, "a party must submit special interrogatories to determine whether any error in an alleged erroneous instruction could have affected the verdict" (*id.* ¶ 122), and this requirement applies to both plaintiffs and defendants. *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 101 (2010).

¶ 65    For a plaintiff to show negligence, he or she must prove that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) that breach was the proximate cause of the plaintiff's injuries. *Steed v. Rezin Orthopedics & Sports Medicine, S.C.*, 2021 IL 125150, ¶ 36. Proximate cause consists of cause in fact and legal cause. *Id.* ¶ 37. Cause in fact is shown when there is a reasonable certainty that the injury would not have occurred but for the defendant's conduct or when that conduct was a substantial factor in bringing about the harm. *Id.* Legal cause involves an assessment of foreseeability and is shown if the injury was reasonably foreseeable; that is, when the defendant's conduct was so closely tied to the plaintiff's injury that he or she should be held legally responsible for it. *Id.* Proximate causation is generally an issue for the jury or trier of fact to determine. *Id.* ¶ 38.

> "The general verdict rendered by the jury in this case creates a presumption that the jury found in favor of Rezin Orthopedics on every defense raised, including the lack of proximate cause. [Citation.] Thus, although the parties' arguments raise questions regarding the standard of care and whether Rezin Orthopedics breached that standard, we may assume the standard and its breach for the sake of discussion, in order to address the proximate cause issue." *Id.* ¶ 36.

¶ 66    Here, plaintiff's contentions of error concern either Chung's standard of care or whether St. Alexius is liable for Chung's alleged negligence. None concern whether Chung's alleged breach of the applicable standard of care proximately caused Marilyn's death and thus plaintiff's injuries. Proximate cause is an independent basis for the jury's verdicts. In other words, the jury could have found for Chung because it found he did not breach the duty of care, because it found that any breach by Chung did not proximately cause Marilyn's death, or both. Similarly, the jury could have found for St. Alexius because it found that Chung was not St. Alexius's apparent agent,

because it found that Chung did not breach the duty of care, because it found that any breach by Chung did not proximately cause Marilyn's death, or any combination thereof. The jury heard evidence, and argument from defendants, concerning proximate causation and then returned a general verdict in favor of Chung. The only special interrogatory concerned whether Chung was St. Alexius's apparent agent.

¶ 67    We find sufficient trial evidence that Chung did not proximately cause Marilyn's death. In August 2012, Michael had Chung's ultrasound report that Marilyn's ovaries were normal but also Gullo's CT report of a seven-centimeter teratoma. As Michael testified at trial, he knew in August 2012 that a CT test was a more definitive test than an ultrasound to diagnose a teratoma, and he knew that the standard of care required him to recommend first removing the teratoma if a patient who wanted to get pregnant had a seven-centimeter teratoma. Michael also examined Marilyn in August 2012 and found no adnexal abnormalities and an enlarged uterus he considered to be consistent with fibroids. He opined that Marilyn had fibroids rather than a teratoma and told her that she did not need surgery to remove a teratoma and could continue with *in vitro* fertilization. Karande then implanted Marilyn with embryos in December 2012, though he testified that he would not have done so had he known she had a teratoma larger than two centimeters. A jury could reasonably conclude on this evidence that Chung's acts or omissions did not proximately cause Marilyn's death.

¶ 68    In sum, because plaintiff raises no contentions of error regarding proximate causation and the evidence was sufficient to show that Chung did not proximately cause Marilyn's death, we must presume that the jury found in favor of Chung with respect to proximate causation and must affirm the jury's verdicts under the general verdict rule. Thus, "the determination of [plaintiff's contended] errors is not essential to our disposition." *Id.* ¶ 48.

21

¶ 69    In our previous opinion, we found the general verdict rule inapplicable because the jury was instructed to first determine whether Chung was negligent before reaching the issue of proximate causation, and we saw a significant probability that errors regarding Chung's negligence caused the jury to not reach proximate causation. However, as defendants correctly note, the general verdict rule has been applied to proximate causation and affirmative defenses. See *id.*; *Lazenby*, 236 Ill. 2d at 101-02.

¶ 70    Plaintiff has responded to the petitions for rehearing, arguing against application of the general verdict rule. He claims that it would have been impossible for him to construct a proper special interrogatory. However, a "special interrogatory is in proper form when it 'consists of a *single*, direct question that, *standing on its own*, is dispositive of an issue in the case such that it would, *independently*, control the verdict with respect thereto.' " (Emphases in original.) *Allen*, 2021 IL App (4th) 200360, ¶ 122 (quoting *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 30). Defendants reply that the jury could have been given a special interrogatory on the dispositive issue of proximate causation, such as "Did any act or omission of Dr. Chung proximately cause the injuries and death of Marilyn Perez?" We find that a "yes" from the jury to such an interrogatory would have allowed plaintiff's contentions to proceed herein.

¶ 71    Plaintiff also argues that there is an exception to the general verdict rule for errors that hamper a party from presenting his or her case. See *Arient*, 2017 IL App (1st) 162369, ¶ 45 ("the trial court's evidentiary errors in no way hampered the defendants from presenting a defense on two of the acts of negligence charged against Dr. Hussein, and the defendants have not argued that the jury's verdict was in any respect against the manifest weight of the evidence"). However, this court rejected a similar contention in *Wright-Young v. Chicago State University*, 2019 IL App (1st) 181073, ¶ 108.

"The Board's only argument for why the general verdict rule should not apply is that it was prejudiced by an 'avalanche of highly prejudicial evidence' relating to its failure to provide adequate security at the basketball game, a theory of liability that should never have been presented to the jury. Although we agree that this was unfortunate, the general verdict rule *presupposes* that a jury will have heard evidence it should not have. Section 1201(d) expressly applies when *several* grounds of recovery are advanced at trial and even *one* is legally sound and supported by the evidence. [Citation.] By enacting it, the legislature clearly prioritized the upholding of jury verdicts, wherever possible, over the prejudice a losing party may have suffered as a result of a jury's exposure to evidence relating to legally defective or insufficiently supported theories. This is a priority long shared by courts." (Emphases in original.) *Id.* (citing 735 ILCS 5/2-1201(d) (West 2016)).

That conclusion is not changed by the fact that the supreme court in *Steed* applied the general verdict rule and found "the determination of these errors is not essential to our disposition" but also found "[i]n addition" that the alleged error was not grounds for a new trial. *Steed*, 2021 IL 125150, ¶ 48.

¶ 72                                    IV. CONCLUSION

¶ 73    Accordingly, the judgment of the circuit court is affirmed.

¶ 74    Affirmed.

---

**No. 1-18-1887**

---

| | |
|---|---|
| **Cite as:** | *Perez v. St. Alexius Medical Center*, 2022 IL App (1st) 181887 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-L-10905; the Hon. Edward S. Harmening, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Robert S. Baizer, Joseph E. Kolar, and David A. Neiman, of Romanucci & Blandin, LLC, and Michael W. Rathsack, of the Law Offices of Michael W. Rathsack, both of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Karen Kies DeGrand and Laura Coffey Ieremia, of Donohue Brown Mathewson & Smyth LLC, and Amy L. Anderson and Teresa R. Maher, of Brenner, Monroe, Scott & Anderson, Ltd., both of Chicago, for appellee Jeffrey E. Chung.<br><br>Hugh C. Griffin, David C. Hall, and Matthew J. Ennis, of Hall Prangle & Schoonveld, LLC, of Chicago, for other appellee. |