2025 IL App (1st) 240277-U

SIXTH DIVISION

November 7, 2025

No. 1-24-0277

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| LOGAN ROSENTHAL, as Independent Administrator of the ESTATE OF PHILLIP ROSENTHAL, deceased, | ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 20 L 2363 |
| | ) | |
| SCOTT BORNSTEIN, M.D. and EYE CARE LTD., | ) | Honorable |
| | ) | Karen L. O'Malley, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Pucinski and Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held:*    We affirm the jury's verdict for defendants pursuant to the general verdict rule because plaintiff's claims on appeal fail to challenge each ground on which the jury could have found for the defendants.

¶ 2    This case arises from medical treatment Phillip Rosenthal received from the defendant Dr. Scott Bornstein (whose medical group, Eye Care Ltd. (hereinafter, collectively, Bornstein) was also named as a defendant) on July 9, 2019. Phillip unfortunately passed away during the pendency of this litigation, and his son, Logan Rosenthal, assumed the role of plaintiff as the independent administrator of Phillip's estate. During the treatment at issue, Bornstein treated Phillip for shingles by prescribing Valacyclovir, commonly known as Valtrex. According to Phillip, Bornstein ordered the wrong dosage by failing to properly account for Phillip's pre-existing conditions (including renal failure needing dialysis). Bornstein's prescription was one gram of Valtrex every 8 hours. Phillip experienced symptoms including an altered mental state shortly after the visit and presented to Glenbrook Hospital on July 11, 2019. This resulted in an extended hospitalization in multiple facilities that lasted until August 9, 2019. Phillip was then discharged to Brentwood, a rehabilitation facility, where he remained until September 2019. Bornstein maintained that his dosage was appropriate, the record did not show Phillip suffered from Valtrex toxicity and, if he did, it was not the cause of the hospitalization. In making these defenses, Bornstein pointed to other medical conditions Phillip was suffering from in July 2019, including a bacterial infection in his liver that spread to his lungs, which was discovered during the hospitalization.

¶ 3    Following trial, the jury ruled generally in Bornstein's favor as there were no special interrogatories. Logan now appeals, arguing that the circuit court erred by admitting evidence regarding two issues: (1) Bornstein's testimony at trial that he complied with the standard of care by consulting the Physician's Desk Reference (PDR) during his treatment (and the admission of corresponding expert testimony), and (2) references during trial, elicited by defense counsel, of three conditions mentioned in Phillip's medical records as part of his differential diagnosis

2

(meningitis, meningoencephalitis, and encephalitis), which he maintains should have been barred because Bornstein never disclosed expert opinion that any of those three conditions caused Phillip's hospitalization. We affirm the jury's verdict because, as explained below, Logan's claims on appeal do not challenge each defense theory raised by Bornstein that could independently support the jury's verdict.

¶ 4                                    BACKGROUND

¶ 5    In his initial complaint, filed on February 26, 2020, Phillip brought a claim for professional negligence, alleging that on July 9, 2019, Bornstein "inappropriately prescribed Valtrex," which proximately caused him injury. On August 20, 2020, Logan filed a motion to spread Phillip's death of record. Logan than amended the complaint, assuming the role of plaintiff as the independent administrator of Phillip's estate and adding wrongful death and survival counts. The circuit court later granted Bornstein's motion for summary judgment on the wrongful death claim.

¶ 6    In Bornstein's pretrial disclosures pursuant to Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018), he listed himself as a Rule 213(f)(3) controlled expert witness, and disclosed, in relevant part, that he would "testify consistently with the medical records, his custom and practice, and his independent recollection," and was "expected to testify regarding the care and treatment of plaintiff's decedent."

¶ 7    Bornstein disclosed additional witnesses, including, in relevant part, Dr. John Segreti as a Rule 213(f)(3) expert in infectious disease. Segreti was expected to testify that, "based on the decedent's medical records, the dosage of Valtrex *** was neither a cause nor contributing cause of the decedent's admission to Glenbrook North Hospital and elongated stay at Glenbrook North and Brentwood.*** Instead of Valtrex, Dr. Segreti will explain the cause of the extended hospital admission was the decedent's liver abscess, which grew pseudomonas, and the development of

sepsis, and decortication. *** Dr. Segreti will explain the decedent's altered mental status resulted from sepsis, not Valtrex."

¶ 8      Additionally, Bornstein listed Dr. Frank Paloucek, a toxicologist, as a Rule 213(f)(3) expert who was expected to testify that "there was no clinical overdose or toxicity" from Valtrex and the drug "was neither a cause nor a contributing cause of the decedent's admission to Glenbrook North Hospital and elongated stay at Glenbrook North and Brentwood." Finally, Dr. Kathleen Scarpulla, an ophthalmologist, was expected to testify that Bornstein's conduct complied with the standard of care, in part because he "acted reasonably by consulting the PDR."

¶ 9      During the discovery process, Bornstein testified at his discovery deposition as follows:

"LOGAN'S COUNSEL:  Did you review the PDR or the dosage recommendations from the manufacturer of Valtrex, did you review that?
BORNSTEIN:  Can you be more specific?
Q: Sure. Have you reviewed the PDR in relationship to dosage recommendations for patients with end-stage renal disease on hemodialysis?
A:  I have in the past reviewed that.
Q: When was the last time you reviewed it?
A:  I must have reviewed that when this deposition was arranged.
Q: Okay. So whenever we started talking about getting your deposition, you took –
A:  That would be the most recent time that I reviewed it. I have reviewed it in the past as well."

¶ 10    Bornstein later responded to the question, "Based upon your review of the PDR, did you follow [the] recommendations [of the PDR] when you administered Valtrex***? with "Yes," then continued:

"Mr. Rosenthal *** was on hemodialysis. And so if you look in the PDR, the recommendations for dosing changes are based on different levels of renal failure. He ***

was at that point actually on dialysis. So he was not in one of those categories that's for

renal failure. He was past the point of renal failure and now being dialyzed. And so when

you read through the PDR, it gives—if I recall—an area for hemodialysis patients and it

4

has a specific section on that that is outside of the guidelines of dosing changes in different degrees of renal failure."

¶ 11 During Dr. Scarpulla's discovery deposition, she testified in relevant part that it was her understanding that Bornstein looked up the dosage of Valtrex in the PDR on July 9, 2019, when he treated Phillip. When asked what she based this understanding on, she first stated Bornstein's deposition and the medical records but later acknowledged she did not review Bornstein's deposition before providing her opinions to defense counsel for inclusion in the Rule 213 disclosures. Instead, portions of her opinions were based on discussions she had with defense counsel, who "relayed to [her] that Dr. Bornstein had the checked the PDR and saw the dosing."

¶ 12 Before trial, Logan filed motions *in limine* (MIL), including the following:

A. "Motion *in Limine* #5—To Bar Testimony of Dr. Kathleen Scarpulla";

B. "Motion *in Limine* #11—To Bar Scott Bornstein M.D. From Testifying He Looked at the PDR Prior to Prescribing Valtrex to Decedent";

C. "Motion *in Limine* #14—To Bar Scott Bornstein, M.D. from Giving Opinions on the Reason[s for] Phillip Rosenthal's July 11, 2019 Hospitalization and Subsequent Treatment"; and

D. "Motion *in Limine* #20—Motion to Bar *** Any Mention of Meningitis."

¶ 13 On August 18, 2023, before the start of trial testimony, the parties argued the MILs. On Logan's MIL #5, his counsel contended Scarpulla had no basis to conclude that Bornstein reviewed the PDR in connection with his treatment of Phillip because the information only came from defense counsel, not the medical records or Bornstein's deposition testimony. Defense counsel argued Bornstein's deposition testimony was "he was asked if he referred to the PDR and he said yes. He's never asked when he looked at the PDR," and continued, "I know what his testimony is

going to be, and I told Dr. Scarpulla he will testify to this. I'm not giving her opinions." Logan's counsel responded, "I will say for sure I did not ask him did you specifically look at the PDR prior to the prescription. I didn't ask that question." The circuit court denied the motion and found Scarpulla could offer both standard of care and causation testimony.

¶ 14    On MIL #11, defense counsel said Bornstein's expected testimony that he consulted the PDR in connection with Phillip's treatment was a fact, not an opinion, and thus not subject to a Rule 213-based objection for failure to disclose. The circuit court denied the motion, stating, "the very specific fact of the timing of when he looked at the PDR, although he didn't testify to that (at his discovery deposition), I don't think that that's a reason to bar his testimony as to that fact pursuant to 213."

¶ 15    On MIL # 14, the circuit court ruled it would permit Bornstein to offer causation testimony regarding why Phillip was admitted to the hospital because Bornstein "reviewed the records."

¶ 16    On MIL #20, defense counsel argued that meningitis references were "throughout the medical records," and thus it would be improper to bar reference to the condition at trial. Logan's counsel responded, "None of the treaters are coming in to testify to it.*** They do not have a competent *** expert to come in and testify that this man had meningitis," but acknowledged "there [are] all kinds of notes in the chart that say potential meningitis, questionable meningitis." Defense counsel responded that meningitis was "in the differential [diagnosis], just like Valtrex toxicity ***. There's never a diagnosis of Valtrex toxicity." The circuit court denied the motion.

¶ 17    Testimony began on August 22, 2023. Logan called Bornstein as an adverse witness. Bornstein agreed with counsel that he was not an expert regarding meningitis or encephalitis, at which point Logan's counsel asked for a sidebar and renewed the request that the circuit court bar Bornstein from testifying about causation, which the court denied.

¶ 18   Bornstein agreed that at Scarpulla's deposition, she testified the proper Valtrex dose for Phillip was 500 milligrams (mg) a day (1/6 of the amount Bornstein prescribed). He further acknowledged that the other expert witnesses in this case, including his own retained experts, agreed that 500 mg a day was the correct dosage, and that a note in the medical records mentioned that Phillip had been prescribed the wrong dosage of Valtrex. At the time Bornstein prescribed Valtrex to Phillip, he believed he prescribed the "correct dosage," and generally that his care of Phillip "was reasonable given the circumstances." The PDR was a "recommendation" and not "a standard of care." Bornstein agreed "when you have acyclovir in your system and you're renally insufficient, your body can't clear that acyclovir without dialysis."[1]

¶ 19   Bornstein maintained that he looked at the PDR when he treated Phillip on July 9, 2019, but admitted he did not write this in the note he authored that day. Phillip's wife Andrea called him after Phillip went to the hospital, at which point he authored a new note. While this note also did not mention the PDR, Bornstein did write that he was "unsure" of the Valtrex dosage. Bornstein agreed a reasonably careful physician would not prescribe medication to a patient without knowing the appropriate dose.

¶ 20   In the medical records, Bornstein saw "many notes" that mentioned "meningitis or meningeal encephalitis," and maintained that the "neuro" notes specifically "had [meningitis] down as a diagnosis." He agreed one of Phillip's infectious disease treaters indicated in the records that they believed Phillip's acute state was due to Valtrex toxicity.

---

[1] Acyclovir is another antiviral medication used to treat shingles. Bornstein explained, "The most common antivirals we use (to treat shingles) are acyclovir and valacyclovir, which is called Valtrex. The reason why acyclovir has fallen out of favor is because the dosing on it was very difficult for people to use."

¶ 21   On questioning from his attorney, Bornstein testified that he had known Phillip for at least 10 years before July 9, 2019. On that day, Phillip presented with "the worst swelling around an eyelid in a patient with shingles that I've seen in my career." His routine in prescribing Valtrex was to refer to the PDR. He interpreted the proper dose for Phillip from the PDR passage that, "Patients requiring hemodialysis should receive the recommend dose of Valtrex," interpreting "the recommended dose" as not meaning a reduced dose because the PDR did not specify "the recommended dose under renal impairment." He acknowledged he did not testify at his deposition that it was his custom and practice to check the PDR when treating patients like Phillip.

¶ 22   After hearing Bornstein's testimony in Logan's case-in-chief, the circuit court reversed itself between trial sessions and granted Logan's MIL #14 to bar Bornstein from "offer[ing] an opinion as to the reason for the hospitalization or the diagnosis of either *** form of meningitis."

¶ 23   Logan and Harley Rosenthal (Phillip's son and Logan's brother) testified as to their observations of Phillip during his hospitalization and the effect the hospitalization had on Phillip.

¶ 24   Dr. Stuart Sprague, a nephrologist, testified via evidence deposition. He was Phillip's treater for his end-stage kidney disease, and started treatment after Phillip had a kidney transplant and was already experiencing a decrease in function. Valtrex could cause "acute kidney injury" if given in high doses. By July 9, 2019, Phillip was on hemodialysis. Valtrex is "not a drug that is readily cleared by hemodialysis."

¶ 25   Dr. Robert Mason, Logan's retained expert in ophthalmology, testified that a reasonable ophthalmologist would have prescribed Phillip 500 mg a day of Valtrex given his condition, meaning Bornstein prescribed far too much, which constituted a breach of the standard of care. The dose Bornstein prescribed to Phillip was "toxic." Mason also opined that the record showed

Bornstein prescribed Valtrex without knowing the appropriate dose and failed to appropriately interpret the PDR, which each constituted distinct breaches of the standard of care.

¶ 26   Dr. Howard Pitchon, Logan's retained infectious disease expert, testified that in his opinion to a reasonable degree of medical certainty, "the use of Valtrex at the extremely high doses that were used caused the ultimate hospitalization," of Phillip, and also "promulgated further hospitalization there as well as into the nursing home." Pitchon did not believe Phillip had sepsis on July 11, 2019. Based on Phillip's white blood cell count, he believed it was "possible" but "unlikely" he had meningitis, and, in his opinion, Phillip did not have meningitis or meningoencephalitis.

¶ 27   On cross-examination, Pitchon answered the question, "Is there a diagnosis this man suffered from Valtrex toxicity?" with "No." The treatment for Valtrex toxicity is to stop the drug, and in Phillip's case to then "dialyze the patient," but the record showed Phillip's treaters continued to use acyclovir. Pitchon explained that the treaters, "were concerned that he had either an encephalitis or meningitis from the herpes zoster (shingles). The best drug to treat it was the [a]cyclovir." He agreed that medical records reflected that "eight separate" treating physicians had noted Phillip suffered from "zoster encephalitis." Zoster meningitis, encephalitis, and meningoencephalitis were mentioned "variabl[y]" throughout the notes, and Pitchon agreed each of those conditions could cause an altered mental state.

¶ 28   Pitchon further acknowledged that on July 12, 2019, the day after Phillip went to the hospital, treaters removed two liters of fluid from his lungs due to an infection that predated the hospitalization and took "at least a few days" to accumulate. On July 14, Phillip's treating physicians also determined he had a liver abscess. Pitchon believed the liver abscess led to the fluid in Phillip's lungs. He acknowledged the discharge summary dated August 9, 2019, indicated

Phillip had been treated for "metabolic encephalopathy secondary to septic shock," "lung empyema (an accumulation of pus)" and the liver abscess. Pitchon believed the summary was inadequate, in part because it did not mention Valtrex toxicity. A separate "detailed summary" of Phillip's hospitalization later in the medical records also did not mention treatment for Valtrex toxicity.

¶ 29    Dr. Richard Quigg, Logan's retained expert in nephrology, testified that, in his opinion, Phillip's symptoms and hospitalization were caused by "an excessive amount of a drug that's excreted by the kidney, and he didn't have kidney function, so it accumulated to a toxic level, and the – it's well known to have central nervous system toxicity. So overall, it was quite clear to me that it was [a]cyclovir toxicity from six times the *** dose that he should have gotten over several days." On cross-examination, he agreed that a patient who ingested too much Valtrex would not necessarily suffer Valtrex toxicity as a result.

¶ 30    The parties stipulated that Andrea passed away before trial, as well as to the amount of certain medical bills from Phillip's treatment. Logan then rested, and the circuit court denied Bornstein's motion for a directed verdict.

¶ 31    Bornstein called Scarpulla to testify. Before she did so, the circuit court conducted *voir dire* regarding "her qualifications on causation," and ultimately changed its initial MIL ruling and stated, "I don't find that there's sufficient foundation for this doctor to offer causation opinions." When trial testimony resumed, Scarpulla testified that in her opinion, Bornstein's treatment of Phillip did not violate the standard of care. Her basis for this opinion was that Bornstein "prescribed the dosage that we use for [shingles], but because the patient is immunocompromised, and he's on dialysis, and we know that [Valtrex] is cleared by the kidneys, he contacted the patient's physician." She agreed the standard of care was to prescribe the dosage "suggested by

the PDR." Scarpulla also acknowledged that in addition to her review of medical records and depositions, she based her opinions on phone conversations she had with defense counsel.

¶ 32   On cross-examination, Scarpulla agreed that Bornstein did not testify in his discovery deposition that he looked at the PDR before deciding Phillip's dosage, stating "it's not in the deposition, because it wasn't asked." She agreed that if Bornstein did not look at the PDR in his treatment of Phillip, that would be a deviation from the standard of care. She "took *** information" from defense counsel and "there wasn't anything in Dr. Bornstein's deposition that disagreed with what I formed my opinion on based on [defense counsel's] description of Dr. Bornstein's description of what happened." The amount Bornstein prescribed was not the "recommended dose."

¶ 33   Segreti testified that in his opinion to a reasonable degree of medical certainty, a "possible Valtrex overdose did not contribute to the extended hospital admission." Instead, the extended hospitalization and treatment occurred because Phillip:

> "[W]as found to have an infection in the liver. He had an abscess in the liver that the doctors taking care of him thought eroded through the diaphragm into the lower part of the chest causing what's called an empyema, which is a collection of pus within the chest. And he needed that taken care of. He needed the abscess in the liver drained and they put a chest tube into his chest."

Segreti explained that further procedures were needed because of the abscess, including a "thoracotomy" and a "decortication," which elongated the hospitalization, and that Phillip received IV antibiotics "for the organism that caused the liver abscess." The liver infection began at least a week before Phillip had a CT scan performed in the hospital on July 14, 2019.

¶ 34    Segreti opined that Phillip did not suffer from Valtrex toxicity because "he had other reasons for the change in mental status primarily the bacterial infection," which eventually caused "septic shock" two days after his initial admission to the hospital. He acknowledged Phillip's vital signs were relatively normal when he first presented to the emergency room. Segreti further testified that, in his opinion, the medical records indicated Phillip's treating physicians treated him for viral meningitis by administering acyclovir.

¶ 35    Bornstein also called Paloucek, who testified, "I do not think to a reasonable degree of certainty that the sole thing [Phillip] suffered from was the Valtrex *** toxicity." He responded to the question "do you have an opinion to a reasonable degree of medical certainty as to whether it was something other than Valtrex toxicity that was more likely causing his altered mental status?" with:

>    "No, I couldn't say that. I'd have to say that there were other things mentioned in the records
>    that I saw that were more serious that needed to be considered, and that would be, for
>    instance, the potential findings supporting the possibility that he had central nervous system
>    viral infection.*** He also had findings, abnormal findings in his liver and his lungs which
>    would suggest that there was other potential conditions ongoing. Liver disease can
>    theoretically cause this.*** [N]o one thing could be determined."

¶ 36    During the jury instruction conference, Logan's counsel requested a limiting instruction reading, in relevant part, "You are to disregard any testimony, medical records, or statements by attorneys stating or inferring that viral meningitis, bacterial meningitis, meningoencephalitis, and Varicella-Zoster virus meningitis were the cause or even a cause of Phillip Rosenthal's admission to the hospital." The circuit court refused to read the instruction, explaining, "the defense cannot argue that [the conditions at issue were] the cause or a cause of the hospitalization because there

is no testimony to that effect. [But the conditions are] in the record, it's a differential diagnosis, but you can't make the argument that it's the cause."

¶ 37    During closing arguments, defense counsel contended in relevant part that Phillip had, "two different bacterial infections going on and a viral infection. There is no doubt about any of that. And we had testimony that those infectious processes caused his central nervous system disorder." He stated later, "Dr. Segreti *** explained that these smoldering infections can cause central nervous system disorder or problems, and we know he had this." Later, counsel stated, "when you find out he's got this pleural effusion (fluid in his lungs), which turns out to be empyema, he has liver abscess, and you grow out two different types of bacteria, now you realize there are other causes of this."

¶ 38    The jury ruled for Bornstein. The verdict form read, "We, the jury, find for the Defendants Scott Bornstein, M.D. and Eye Care, Ltd. and against Plaintiff, Logan Rosenthal, Independent Administrator of the Estate of Phillip Rosenthal, deceased." The circuit court later denied Logan's motion for a new trial, and this appeal followed.

¶ 39                              JURISDICTION

¶ 40    The circuit court denied Logan's motion for a new trial on January 26, 2024, and he filed his notice of appeal on February 7, 2024, giving this court jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017).

¶ 41                              ANALYSIS

¶ 42    On appeal, Logan brings four claims centering on alleged evidentiary errors by the circuit court. Specifically, Logan claims that (1) Bornstein should not have been permitted to testify he consulted the PDR because that testimony was insufficiently disclosed pretrial under Rule 213; (2)

Scarpulla's opinion that Bornstein did not violate the standard of care should have been excluded because it had an insufficient basis in the record; (3) the court should have barred all mention of meningitis, meningoencephalitis, and encephalitis because Bornstein failed to offer expert opinion that any of the three conditions caused Phillip's symptoms or hospitalization; and (4) the court compounded this error by refusing to provide the limiting instruction that the jury should not consider any mention of those three conditions in deciding causation.

¶ 43    Bornstein's first response is that the jury returned a general verdict, and Logan did not submit special interrogatories, meaning this court must affirm under the general verdict rule. The general verdict rule provides "that a general verdict for the plaintiffs or the defendants without special interrogatories will not be disturbed if the case involved two or more determinative issues, or two or more theories were presented, and there was sufficient evidence to support at least one of the issues or theories that was free from prejudicial error." *Perez v. St. Alexius Medical Center*, 2022 IL App (1st) 181887, ¶ 64. A general verdict creates the presumption that the jury ruled in favor of a prevailing defendant on every defense raised. *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 101-02 (2010). It also creates a presumption that the jury resolved all factual issues in favor of the prevailing party. *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 51. The requirement to submit special interrogatories applies to each party. *Lazenby*, 236 Ill. 2d at 101.

¶ 44    The record shows that Bornstein presented two distinct causation theories: (1) the medical records were too inconclusive to isolate Valtrex toxicity as a cause of Phillip's hospitalization, presented through Paloucek, and (2) Phillip's symptoms and hospitalization were caused by the bacterial liver infection which spread to his lungs, ultimately causing sepsis, presented by Segreti.

14

¶ 45   We find the general verdict rule requires this court to affirm the jury's verdict because Logan raises no claim of error as to Segreti's liver/lung infection causation theory. Under Illinois precedent, in applying the general verdict rule, we must presume the jury ruled in Bornstein's favor on each theory he raised. *Id.* at 101-02. This includes the causation theory presented by Segreti that the bacterial infection in Phillip's liver that then spread to his lungs caused his altered mental state, the initial presentation to the hospital, and his extended hospitalization. Logan's claims of error on appeal do not concern the liver/lung infection theory, nor does Logan argue that the evidence was insufficient for the jury to accept the theory. As such, Logan failed to raise a claim of error on a defense theory on which the jury could have independently based its verdict, meaning we must affirm. *Perez*, 2022 IL App (1st) 181887, ¶ 64.

¶ 46   Logan argues that his causation claim on appeal regarding the improper admission of testimony on meningitis, meningoencephalitis, and encephalitis is broad enough to constitute a challenge to the liver/lung infection theory, but this argument fails on the face of the record. Segreti's testimony was that the bacterial infections in the liver which spread to the lungs were the specific cause of both the symptoms and hospitalization, with no mention of any role of the above-listed conditions. That defense counsel asked separate questions about viral meningitis unrelated to Segreti's distinct causation opinion does not impact this calculus. While such questions could impact the jury's analysis of Paloucek's causation theory, the general verdict rule requires this court to presume that the jury found for Bornstein on *both* causation theories for purposes of analyzing the claims on appeal. See *Robinson v. Boffa*, 402 Ill. App. 3d 401, 407 (2010) (the defendant presented two causation theories, either one on which could support the verdict, meaning the general verdict rule precluded reversal when the claimed error only affected one theory); see also *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 492 (2002) (Where the defendant failed to submit

15

special interrogatories and plaintiff submitted multiple theories of negligence, "there [was] no way of knowing on what theory the jury found defendants negligent," and thus the court refused to "set aside the verdict.").

¶ 47    This case is representative of why the general verdict rule exists, and why the use of special interrogatories is so important in complex litigations. Here, without special interrogatories to determine whether the jury decided Bornstein did not breach the standard of care and/or either one of the causation theories, this court risks ordering a new trial for a case in which the jury based its verdict on a valid basis supported by the record and free of any alleged error. Granting a new trial under these circumstances circumvents the role of the factfinder and is a result appellate courts avoid whenever possible. See *Perez*, 2022 IL App (1st) 181887, ¶ 71 (citing *Wright-Young v. Chicago State University*, 2019 IL App (1st) 181073, ¶ 108).

¶ 48    Finally, Logan argues that the general verdict rule should not apply because it is only applicable when an appellant raises a claim of jury instruction error, citing this court's unpublished order in *Banks v. Advocate Health and Hospital Corp.,* 2021 IL App (1st) 191728-U. This argument fails because there is no support from Illinois precedent to so limit the general verdict rule; indeed, it is routinely applied in other contexts. See *Lazenby*, 236 Ill. 2d at 102 (applying the general verdict rule to claims not involving jury instruction); *Perez*, 2022 IL App (1st) 181887, ¶¶ 62, 66-71 (applying rule when errors raised included a Rule 213 evidentiary error); *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 46 (applying rule in context of evidentiary error).

¶ 49    Logan provides no further support for this proposition, conceptually or precedentially, beyond the *Banks* case. In *Banks*, this court found the general verdict rule did not apply because (1) the error at issue was the improper admission of character evidence, which infected the whole

proceeding, and (2) the appellee had not presented two distinct theories at trial. *Banks*, 2021 IL App (1st) 191728-U, ¶¶ 17-20, 23. This was a proper application of the rule. This court acknowledges, however, its statement in *Banks* that the general verdict rule applies "only where a party is challenging a jury instruction." *Id.* ¶ 24. We clarify now that this statement was overly limiting, as the *Boffa* passage cited in support does not stand for that proposition, and no guidance from our supreme court has applied such a limiting principle. See *Boffa*, 402 Ill. App. 3d at 406. If and until the supreme court directs otherwise, litigants should refrain from citing *Banks* for this proposition.

¶ 50                                    CONCLUSION

¶ 51    Logan's claims on appeal do not reach the liver/lung infection theory, and as such, we must affirm pursuant to the general verdict rule.

¶ 52    Affirmed.